C. A. REDMAN v. THE STATE.

No. 1137.    Decided November 1, 1911.

Rehearing denied June 28, 1912.

1.—Murder—Statement of Facts—Filing.

Whatever may have been the wording of the statutes heretofore, the Thirty-Second Legislature in effect expressly provided that in felony cases statements of fact filed at any time within ninety days from the perfecting of the appeal, or

the adjournment of the court, as the case may be, should be considered as filed in time.

**2.—Same—Evidence—Res Gestae.**

Upon trial of murder, where the evidence showed that just before the fatal shots were fired the wife and little daughter of the deceased remonstrated with the defendant not to shoot the deceased any more, there was no error in the ruling of the court in admitting this testimony as part of the transaction. Following Jeffries v. State, 9 Texas Crim. App., 598, and other cases.

**3.—Same—Evidence—Circumstances—First Meeting.**

Where, upon trial of murder, testimony that the deceased was the assistant superintendent of a Sunday school, which was admitted as a circumstance to show that defendant could have seen and did see deceased through the open windows of the school house, and that this was his first meeting of deceased after defendant had been informed about his statement concerning a female relative of defendant, there was no error.

**4.—Same—Evidence—Child of Prosecutrix.**

Where, upon trial of murder, the court upon the suggestion of counsel ordered that the child of a State's witness of which defendant was charged to be the father, should not be brought into the court house before the jury while said witness was testifying, and that this order of the court was carried out in the examination in chief, but when the witness was afterwards recalled this order was inadvertently ignored, but no injury was shown, and the fact was not referred to by any one, there was no reversible error.

**5.—Same—Testimony too Remote—Paternity of Child.**

Where, upon trial of murder, the evidence showed that the homicide grew out of the fact that the deceased had made the statement that a female relative of defendant was with child by defendant, there was no error in not admitting testimony with reference to the conduct and statement of this female relative to her aunt which did not involve either the defendant or any one else with reference to her condition, and threw no light on the paternity of the alleged child, and the testimony was entirely too remote and uncertain to be admissible. Davidson, Presiding Judge, dissenting.

**6.—Same—Evidence—Absent Witness—Depositions.**

Where, upon trial of murder, the State claimed that the defendant was the father of the illegitimate child of one of the State's witnesses, and defendant contended that he killed the deceased because he had made the statement that the defendant was the father of said child, and made efforts during the trial to impress upon the jury that an absent witness beyond the limits of the State was the father of said child and had fled the country on that account, there was no error in permitting the State to show where said absent party was and that defendant's counsel knew where he was and could have gotten his deposition.

**7.—Same—Motion for New Trial.**

Upon appeal from a conviction of murder it was not necessary to consider a bill of exceptions to the overruling of appellant's motion for new trial which presented a number of grounds.

**8.—Same—Evidence—Impeaching Witness—Ground of Objection.**

Where, upon trial of murder, the court refused to permit the defendant to traverse and contradict the testimony of the widow of the deceased with reference to certain alleged statements she made as to the absence of the party whom defendant charged with the paternity of the child of the State's witness, etc., and appellant in his brief contended that this testimony was admissible as original evidence, and did not contend that it was admissible for the purpose of impeaching any of the State's witnesses, and the same was inadmissible as original testimony, there was no reversible error.

**9.—Same—Charge of Court—Manslaughter—Insult to Female Relative.**

It is not slander or insult to a female relative in contemplation of the

statute that authorizes the reduction of homicide to manslaughter, where the defendant knows the statement upon which he acts to be true, and there was no error, upon trial of murder, in the court's charge on manslaughter to submit this phase of the case on the evidence in the case; and testimony going to show a lack of chastity by general reputation of such female is admissible in evidence to bring home to defendant the knowledge that the alleged statement concerning said female is not slanderous but true.

### 10.—Same—Case Stated—Truth of Statement—Converse Proposition.

Where, upon trial of murder, the defendant contended that he killed deceased on account of a slanderous statement made by him concerning a female relative to the effect that the defendant was the father of her illegitimate child, and in his testimony denied ever having had sexual intercourse with her, but she testified that he had repeated acts of sexual intercourse with her and that he was the father of her child, the court properly submitted this issue to the jury and instructed them that if defendant had had sexual intercourse with said female and was the father of her child, and that he killed deceased solely because deceased had imputed a want of chastity to her, then the homicide would not be reduced to manslaughter; also submitting the converse of this proposition.

### 11.—Same—Charge of Court—Manslaughter—Insult to Female Relative—First and Subsequent Meeting.

Where, upon trial of murder, the defendant claimed that he killed deceased on account of slanderous statements made by the latter concerning a female relative of defendant, and the evidence showed that defendant did not resent the insult upon first meeting of the deceased, but there was also evidence of subsequent insults and subsequent meetings between the parties, and the court in his charge on manslaughter and adequate cause submitted all these matters properly to the jury who found defendant guilty of murder in the second degree, there was no error.   Davidson, Presiding Judge, dissenting.

### 12.—Same—Charge as a Whole.

It is elementary that in considering the charge of the court the whole of it must be considered and taken together, and where the court's charge, upon a trial of murder, considered as a whole, very fully and amply charged on murder in the first and second degree and manslaughter, and submitted properly all questions of fact arising under each of these questions to the jury, there was no reversible error.   Davidson, Presiding Judge, dissenting.

### 13.—Same—Cases Cited by Counsel—Practice on Appeal.

It is never the purpose of this court to take up each case cited by counsel and show its application or want of application to the question under discussion, and because they are not so taken up and discussed by no means justifies the assertion that the opinion rendered is in conflict with them.

### 14.—Same—Practice on Appeal.

In all appeals to the Appellate Court the questions presented are dealt with as presented by the record and are decided in the light of the evidence, and where the court thoroughly and fully considered all the questions presented on appeal and affirmed the judgment of the court below, there was no error.

Appeal from the District Court of Ellis.   Tried below before the Hon. F. L. Hawkins.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*C. F. Greenwood,* for appellant.—Cited cases in minority opinion.

*C. E. Lane,* Assistant Attorney-General, for the State.

PRENDERGAST, Judge.—On July 2, 1907, the grand jury of Hill County, indicted appellant for the murder of J. C. Roberson on May 20, 1907. He was first tried in Hill County in 1907, convicted of murder in the first degree with the penalty of life imprisonment in the penitentiary. On appeal from that conviction this court reversed the case. It is reported in 52 Texas Crim. Rep., 591. The opinion on that appeal sufficiently states the case to make it unnecessary to make any further general statement thereof now.

After the case was reversed, the venue was properly changed from Hill to Ellis County, where the case was tried in November, 1910, resulting in the appellant's conviction of murder in the second degree and his punishment fixed at ten years in the penitentiary, from which last trial and judgment this appeal is prosecuted.

The State has made a motion to strike out the statement of facts and bills of exception because they were not filed within the time allowed by law. The term of court in Ellis County was held, as allowed by law, for more than eight weeks. It adjourned for the term on December 3, 1910. The motion for new trial was made and overruled on the day the court adjourned. The court then granted thirty days after adjournment to prepare and file the statement of facts and bills of exception. On December 30, 1910, the court granted thirty days from January 3, 1911, and on the latter date again extended the time for ten days from February 1, 1911. The statement of facts and bills of exception were filed within this latter date. It seems to be the contention of the State that only the court in session could make these extensions of the time and cites the decision of the Supreme Court in Couturie v. Crespi, 131 S. W. Rep., 404. Later decisions by the Supreme Court show that the holding of that court is that, although the wording of the statute is not clear, the intention was to give the power to the judge of the court as well as the court in session, and that where such statements and bills were filed within the time thus allowed by the court in session or the judge thereof, such statements should be considered and not stricken out. As we understand, there is no difference between this court and the Supreme Court on that subject, but it being a new statute, and all such matters could as well come before the Supreme Court as this court, we would, in this matter, follow the Supreme Court. It, however, is not necessary for us to discuss the question now, as the regular session of the Thirty-Second Legislature expressly, in effect, provided that statements of facts filed at any time within ninety days from the perfecting of the appeal, or the adjournment of the court, as the case may be, which would be applicable to felony cases in the District Court, should be considered filed in time. So that it is unnecessary for us to further construe the Act of 1909, as it is no longer in effect in this State. The motion of the State to strike out the statement of facts and bills of exception is therefore denied.

Appellant has preserved and presents questions raised by seven bills

of exception and complains of some charges of the court upon which he asks this court to reverse the judgment of the lower court.

The first bill shows that after the trial began and before the evidence was offered, the appellant made a motion showing that on the trial of the case before the jury, the State would undertake to prove by Mrs. Roberson, the wife of the deceased, her exclamations during the shooting and that she was screaming and crying and begging the defendant not to shoot her husband and saying to him, "Please don't shoot him any more," and that her little girl was crying and begging the defendant not to shoot her papa any more, and that the defendant desired to object to the same before it was introduced. The objections to this testimony by the appellant was that such testimony was illegal and incompetent, prejudicial to the defendant and did not tend to illustrate any issue in the case nor shed light upon the guilt of the defendant. These objections were overruled, the testimony admitted and the court, in allowing the bill, explained "that the exclamations objected to occurred while the shooting was in progress and were a part of the transactions."

Mrs. J. C. Roberson, the wife of the deceased, testified that just a few minutes prior to the shooting she saw the appellant and his cousin, Bert Caruth, pass her house, where she was preparing vegetables for her dinner, going in the direction where her husband was plowing in the field, about 240 feet from her doorsteps; that in a few minutes after they passed she heard a pistol fire. She then testified: "I got up and went out on the front gallery to see what it meant. I could see my husband running around the horses' heads, and saw the smoke come out towards him. The horses' heads were turned east. My husband ran around on the north side of the horses, and after I heard the first gun-fire I went out on the gallery and saw my husband running around the horses' heads and saw the smoke, and I ran into the yard, and as I was near the front gate heard the second shot that I heard, and as I was going up the road there were three more shots fired after that, and I saw Redman holding a pistol in his hand, shooting at my husband. I run up the road hollering and screaming for him not to shoot my husband any more. When I stopped my husband had fallen. I never went to where he was. I stopped before I got there. He had fallen, but did not lay on the ground bu just a few seconds, and he got up and steadied himself on his elbow and then got up and started towards me. When I saw he was not killed I stopped and did not go up as far as he was in the field. He started towards me and defendant turned around and saw that he was getting up and he began to follow him, reloading his pistol as he followed him. He was holding the pistol in his left hand and putting in the cartridges with his right. Defendant was about thirty feet away when he saw my husband getting up, and was in about the center of the public road, I think, when he turned around. My husband started angling southwest and was going

towards the house, which was southwest from where he had fallen. There was a barbed wire fence around the field, but there was a gap in the fence and my husband had fallen about twenty-five feet from the gap. The horses ran away immediately after he fell. When defendant turned around and saw my husband get up he turned and was walking towards my husband, and the defendant was going in a rapid walk. Defendant turned before my husband got to the gap, but did not start until he had reached the gap. He had seen my husband get up. I said, 'Arthur, please do not shoot Johnnie any more.' I said this a half dozen times. I don't know the number of times. My little girl and my baby child were with me at the time. My little girl says, 'Please don't shoot papa; please don't shoot papa.' She was right behind me all the time. I guess I was about twenty-five feet from my husband when Redman passed me going up to him. The defendant made no reply to what I said to him; he never said a word. It is about 115 feet from the gap on the east side to the gap on the west side of the road. My husband went through the west gap and defendant was about twenty-five or thirty feet behind him, and it's about 140 feet from this gap to my house. There is a barn just on the inside of the west fence, and about eighteen or twenty feet from the gap on the west side, and the barn is a little northeast of the house. My husband went a few steps in the direction of the house and then turned, with Redman following him, and said, 'Go off and let us alone; go off and let us alone,' and he then turned and went a little northwest into the barn, that is, in the seed shed, which was on the east side of the barn. Defendant was then going in at the gap. It is about twenty-five feet from the gap to the door of the feed shed. The seed shed was on the north side of the barn, and the barn was an old log house with the shed on the east side, and in this shed the door opened out east, and my husband went into this door and held the door to after him. There was nothing on the inside to fasten it with, and there was about six inches of space under the door and some slats to hold the seed in, and he tried to hold the door to underneath the slats; I saw his fingers on the outside there, holding the door to, and defendant walked up and shoved his fingers away and shot him there four times. I was just on the inside of the gap on the west fence at the time. Me and my little girl were both crying and begging him not to shoot any more. My little girl was saying, 'Don't shoot papa any more,' and I would say, 'Arthur, please don't shoot Johnnie any more.' The defendant never said a word in reply to anything we said."

We are of the opinion that the court correctly admitted this testimony as a part of the transaction. Jeffries v. State, 9 Texas Crim. App., 598; Long v. State, 48 Texas Crim. Rep., 175; Hancock v. State, 47 Texas Crim. Rep., 3.

By appellant's second bill he claims that the court erred in permitting, on cross-examination of his witness Bilbry, the State to

prove that the deceased was assistant superintendent of the Sunday-School at the James Schoolhouse, which was near the scene of the killing, and where the Sunday-School of the community was held. The objection to this testimony was that it was an effort to bolster up the character of the deceased when no attack had been made upon his character or reputation by the defendant, and that it was an indirect way to prove his character and standing, and an effort to add respectability to him and assault him before the jury and that it was illegal, incompetent and not binding on the appellant and prejudicial to him and calculated to arouse sympathy in favor of the deceased, irrelevant and immaterial. The court in allowing the bill explains it as follows: "The evidence showed that on a Sunday prior to. the homicide, and after defendant had heard of the statements deceased had made about Kittie Caruth, that defendant was at the schoolhouse where Sunday-School was being conducted; that he was not in the house, but was on the outside; that the State was permitted to prove that deceased was assistant superintendent of the Sunday-School and on this occasion was in the house performing his duties as such; that this evidence was offered and admitted as a circumstance showing that defendant could have seen and did see deceased through the open windows of the schoolhouse; and that this was a meeting with deceased after defendant had been informed of his statements about Kittie Caruth."

The evidence by this witness on this point was that he saw the deceased on Sunday, May 12, at Sunday-School at this schoolhouse and that the deceased at that time first stated to him the condition of Kittie Caruth, which was afterwards communicated to the appellant. On cross-examination he testified: "The Caruth girls attended Sunday-School and so did my son, as well. as Wes Holmes; the defendant also attended Sunday-School there. Jim Sherfey was superintendent of the Sunday-School and the deceased was assistant superintendent. It was just after Sunday-School broke up on the 12th that the deceased had the first conversation with me." The testimony by others showed that the deceased was at this schoolhouse at Sunday-School the following Sunday and that the appellant was also there on the grounds, but not in the house. This bill in connection with the qualification of the judge and the facts surrounding what occurred shows that no error was committed in admitting this testimony.

Appellant's third bill shows in effect that prior to the trial they informed the judge that Kittie Caruth had with her her baby, the paternity of which was charged upon appellant and that it was born in the summer of 1907, and that she would be used· as a witness by the State, and wanted the State's attorneys and the witness instructed that she must not bring the child with her to testify on the stand. The court gave these instructions, and in giving her testimony when first introduced they were obeyed. Then it appears that two or three days later when she was called back to the stand for some

purpose she took the baby with her. The judge in qualifying the bill says: "When the matter was called to the court's attention at first, the court had counsel for the State tell the witness Kitty Caruth not to bring the baby in when she was called in as a witness, and she testified later, and the baby was not brought in with her; the next day, or perhaps two days later, the witness was recalled by the State, and when she came in had the baby with her, when counsel for the defendant called the court's attention to it, the witness had almost reached the witness stand, and to have sent her back or in any way mentioned the baby would call the jury's attention to it; for that reason the court permitted her to testify having the baby with her. No reference was made to the baby during her testimony, neither by her or the attorneys, and during the argument the incident was not referred to." There is no reversible error shown by this bill.

The next bill shows that the appellant placed on the stand Mrs. Emma James, who testified before the court in the absence of the jury substantially to this state of facts: That she married about six years before then an uncle of Kittie Caruth and that she and her husband lived about two miles and a half from Kittie's father, with whom she lived; that she had known Kittie for about six years before the time she testified and visited her at her home a very few times; that on September 24, 1909, she received a letter from Kittie Caruth to this effect: "Dear Aunt Emma: Will write you a short letter. We are all well, and hope you are the same. Have been sewing some for the baby; what have you been doing? Why don't you come over? I believe that is about all I remember. And along about the last it said: Aunt Emma, come over; please come over soon as you can; I have something to tell you, and signed her name." That on the evening of the same day she received the letter she saw Kittie Caruth at Kittie's home. That when she went to the house Kittie's father was not at the house, but was in a potato patch; that he afterwards came to the house and sat on the front porch; that the witness later went back into the kitchen where Kittie was and told her that she had received her letter. Kittie smiled and says, "Did you?" and she replied, "Yes," that she came over to see what she had to tell her. Kittie dropped her hands and said, "Aunt Emma, I can't tell you this evening." She then informed her aunt that her father was going to town the next day, and asked her to ask her father to let her go over and spend the day with her, which was done and Kittie went over and spent the next day with her. That Mrs. James was very busy the next day and until somewhat late in the evening had no opportunity to have Kittie tell her what it was she wanted to tell her, but upon seeing her father some distance off coming to the house she and Kittie went back into the kitchen, Kittie standing in the dining-room door with her head hung down and her aunt then requested her to tell her what she wanted to tell. Kittie replied, "Aunt Emma, I can't," with her face turned away. The witness

asked why, and Kittie replied, "I can't, Aunt Emma," and began to cry. "I never will swear any more lies," and Kittie and the witness both began to cry, and they separated and nothing further was ever said between them on the subject.

The appellant offered this testimony as a circumstance to show that Kittie Caruth was under some restraining influence that was keeping her from telling the truth, and as a circumstance to show that she had previously stated the truth as to the paternity of the child and that at the time of the conversation with Mrs. James she desired to change her evidence.

Kittie Caruth had testified before the grand jury when the indictment was returned on July 2, 1907, that the appellant had never had any improper connection with her. On the said trial in the District Court of Hill County she testified that the appellant was the father of this child born during the summer of 1907. It was proved that she had also stated this at the time of its birth. She testified on this trial that appellant was the father of the child.

This evidence was entirely too remote and uncertain to be admissible for the purposes claimed by appellant or any other purpose in this cause, and the court did not err in excluding it.

The next bill shows that the State placed R. M. Vaughn, private counsel for the prosecution in this case, upon the witness stand, and proved by him that he was acquainted with Wes Holmes; that he had gone to Arkansas and that he had there seen and talked with Wes Holmes and that he had received two or three letters from Holmes since then, the last letter having been received in the last four months, and that the State had issued various processes for said witness, but had failed to get him and that Holmes had promised to come to Texas and testify upon this case and that the prosecution had arranged to pay his expenses (said Holmes had never returned to Texas). The appellant made no objection to this proof, but the State was then permitted to prove by said witness "that he had informed the defendant's counsel as to the whereabouts of said witness Holmes by letter and in person and had told them the postoffice address in Arkansas of said witness Holmes." Appellant objected to this testimony because he had been incarcerated in jail from the time of the killing until about eight weeks before this trial; that the State had not shown that any notice had been given to the defendant himself, either in jail or out of it by anybody as to the whereabouts of said Holmes and that the notification to his counsel did not bind him and as to him was hearsay and because it was illegal, incompetent, immaterial, irrelevant and prejudicial to the appellant.

It was admitted that when the witness Vaughn notified appellant's counsel of the whereabouts of said Holmes the defendant was in jail and that there was no evidence to show, and the State did not offer to show, that the defendant himself was notified of the whereabouts of said Holmes or had any knowledge of the same or that Mr. Vaughn

or anyone else had notified his counsel of Holmes' whereabouts, and that the State did not offer to show and did not show that the defendant had any knowledge as to the whereabouts of Holmes. The court allowed the bill with the explanation: "The defendant's efforts during the trial was to impress upon the jury that Wes Holmes was the father of the child born to Kittie Caruth, and had fled the country on that account; the defendant had at a previous term of court applied for a continuance on account of the absence of Wes Holmes; the court permitted the State to show where Wes Holmes was, and to account for his absence, and to show that defendant's counsel knew where he was, because the State could not take his depositions or secure his presence, whereas the defendant could take his depositions; this was admitted to rebut the efforts being made all through the trial by counsel to by implication and indirection, cast suspicion on Holmes." Notwithstanding, it is stated by appellant in this bill, and elsewhere in the record, that: "The leading and overshadowing issue in the case was as to the paternity of said child, the State contending through its testimony and argument to the jury, that defendant was the father of said child, and the defendant contending and swearing that he was not the father of it; but that the evidence of said Kittie Caruth on said point as to him being the father of it was false, and the defendant contending, through testimony introduced by him, and the argument of his counsel, to the jury, that the evidence showed and tended to show that Wes Holmes, or some other person, other than the defendant, was the father of it," yet, under the circumstances, as shown by the record in this case, and the qualification of the judge in approving this bill, there was no error by the court in admitting the testimony objected to as shown by this bill.

The next bill is as to the overruling of appellant's motion for a new trial which presented a large number of grounds. It is unnecessary to note this further.

The seventh and last bill of exceptions complains of the refusal of the court to permit him, through the testimony of Dr. Menifee, to traverse and contradict the testimony of Mrs. Roberson, the widow of the deceased, in these particulars: She denied, on cross-examination by appellant, that in a conversation she had with Dr. Menifee on her gallery, the evening of the killing, that she stated to him that Kittie Caruth had come to her and had gotten medicine from her twice in the last three months for the purpose of bringing on her monthly period, and that a few days prior to the killing that said Kittie Caruth had come back to her the third time and asked her where Wes Holmes was, and that she told Kittie that Wes Holmes was gone and that Kittie then asked her if she did not think Wes Holmes had left her in a bad fix, and that she stated to Kittie that she was not going to furnish her any more medicine and was going to leave the matter to her grandfather. As shown by the bill it was stated by

appellant's attorneys at the time this testimony was offered, as follows: "The defendant, through his counsel, stated to the court that the defendant offered said testimony to support his theory in the case that Wes Holmes was the father of Kittie Caruth's child, and to rebut her evidence as to the paternity of said child, and that the testimony was offered in connection with all the testimony in the case showing that John Roberson, deceased, had stated that his wife had told Wes Holmes to leave the country and that he had left, and had left no trace behind him, and that it was offered in connection with all testimony in the case that bears upon the relations between Wes Holmes and Kittie Caruth, their clandestine correspondence and the sudden flight of Wes Holmes before the killing, and with the evidence that showed that Mrs. Roberson's brother, Ed Hickey, had brought Wes Holmes to Hillsboro, where he took the train away, and that it was offered in ·connection with the testimony of Ed Bilbry to the effect that shortly before the time that he left the country that he had stated in substance that he was too thick with the Caruth girl and that he was going to leave. That the evidence was offered as original evidence to prove the fact, that is, that after Wes Holmes had left the country, Kittie Caruth was inquiring of his cousin, Mrs. Roberson, as to his whereabouts, said testimony being offered by defendant as original evidence as well as to effect the credibility of Mrs. Roberson and Kittie Caruth, and that said testimony was offered for all purposes."

In appellant's brief his argument and contention is that this evidence by Dr. Menifee was original testimony for all the purposes stated above, and does not contend by his argument and brief that it was admissible for the purpose of impeaching either Mrs. Roberson or Kittie Caruth. As it appears to us, so far as original testimony is concerned, it is clearly and purely hearsay. It could not have been introduced and was not admissible as original testimony bearing on any issue in the case. It seems that if any portion of it might have been admissible for the purpose of contradicting Mrs. Roberson, that this was ignored and only an illegal and improper use of it was sought. Its exclusion, therefore, under the circumstances could not have been such prejudicial error to the appellant as to authorize or permit this court to reverse because of its exclusion.

Appellant complains especially of the twenty-first paragraph of the court's charge. This paragraph is as follows: "If you believe from the evidence beyond a reasonable doubt that before the homicide the defendant had had sexual intercourse with Kittie Caruth, and was the father of a child subsequently born to her, and you further believe from the evidence beyond a reasonable doubt that defendant killed deceased (if he did) not because, or partly because of insulting words uttered by deceased towards Blanche Caruth, but solely because what deceased may have said imputing a want of chastity to Kittie Caruth, then in such event the homicide would not be reduced to manslaughter,

although the defendant had been informed that deceased had stated that Kittie Caruth was in a family way and six months gone, and that defendant was the father of the unborn child, or even though deceased had repeated said statements or admitted that he had so stated in the presence of the defendant at the time of the killing.

"If, however, you believe the defendant had not had sexual intercourse with said Kittie Caruth, or if you have a reasonable doubt as to whether he so had, and if you should further believe that prior to the homicide defendant had been informed that deceased had used insulting words imputing a want of chastity to Kittie Caruth or Blanche Caruth, both or either, and subsequent thereto he met the deceased and did not act on the information he then had, but that after such meeting or meetings (if any) he was informed of further insulting words that deceased had used towards said Kittie or Blanche Caruth, both or either, and the defendant acted upon such information and killed said J. C. Roberson as soon as he met him after having been informed of such additional insulting words (if any), either alone or in connection with the words of which he was first informed, were the cause which induced the defendant to kill deceased, and by reason thereof his mind was inflamed to such a degree as to render it incapable of cool reflection, then the same would be 'adequate cause,' and if you believe that while defendant's mind was in such condition (if it was), or if you have a reasonable doubt thereof, that the defendant shot and killed said J. C. Roberson, and you find defendant guilty, it could be of no higher grade of homicide than manslaughter; or, if you believe defendant, after having been informed that deceased had used insulting words towards Kittie or Blanche Caruth, both or either, sought the deceased in order to talk over the matter of such reports and try to adjust or settle them, and that deceased repeated the said words or admitted that he had used them, and that on account of such fresh provocation in defendant's presence, either alone or in connection with the former information which had reached him, the defendant's mind became inflamed to such a degree as to render it incapable of cool reflection, then the same would be 'adequate cause,' and if you believe that while defendant's mind was in such condition (if it was), or if you have a reasonable doubt thereof, that the defendant shot and killed said Roberson, and you find defendant guilty it could be of no higher grade of homicide than manslaughter." His complaint of the first paragraph of the charge, just above quoted, is that the court had no right to decide, as a matter of law, that if the defendant had had sexual intercourse with Kittie Caruth and killed the deceased on account of insulting words concerning her, that the defendant could not be guilty of manslaughter. That this charge was upon the weight of the evidence and invaded the province of the jury on the issue of fact; that it was for the jury to determine whether appellant was

Vol. LXVII Crim.—25.

guilty of manslaughter, even if they believed that he had had sexual intercourse with Kittie Caruth. This exact question was raised, discussed and decided against appellant in the other appeal of his case, 52 Texas Crim. Rep., 596, wherein this court on this question, said: "We hold that said instruction is the law. It is unnecessary to cite authorities to support the proposition that the character of a female may be proved as a circumstance to throw light upon whether the appellant believed the language slanderous. Certainly, it could not be seriously contended that if Kittie Caruth had given birth to a child, being an unmarried female, deceased had stated this fact to a party who informed appellant, her first cousin, and appellant knew the fact to be true, and he had sought out deceased and killed him, these facts alone would not reduce the killing below murder. We are not here discussing the question as to the lack of belief on the part of appellant of the truth of the statement, but to our mind it is absurd to say that one can claim that he killed a party for insult concerning a female relative, when said party knows the language used about said female is true. It is not slander or insult to a female relative in contemplation of the statute that authorizes the reduction of homicide to manslaughter, where the appellant knows the statement upon which he acts to be true; and if appellant was the father of the child or the author of the shame of Kittie Caruth in this case, he certainly knew it, and knowing it, he could not ask any court of justice in this State to give him a verdict of manslaughter upon said statement. We accordingly hold the charge of the court correct. Furthermore, testimony going to show a lack of chastity by general reputation of a female, by a long line of authorities in this State, has been held to be proper evidence; since it goes to bring home to appellant the knowledge that said statement or supposed slander is not slanderous, but a true statement of what perhaps may be a horrible fact or condition. The theory for killing deceased for insult to a female relative is that appellant, at least, believes deceased is lying. If he knows he is telling the truth, it is absurd, as stated above, to claim any such defense."

While the appellant in his testimony denied ever having had sexual intercourse with Kittie Caruth and denied that he was the father of her child born about three months after the killing, she, as positively, testified that he had repeated acts of intercourse with her and that he was the father of her child. By this paragraph of the court's charge this question of fact was properly and specifically submitted to the jury and they were aptly told that if the appellant had had sexual intercourse with Kittie Caruth and was the father of the child subsequently born to her, and that he killed the deceased solely because of what deceased had said about Kittie Caruth, imputing a want of chastity to her, then the homicide would not be reduced to manslaughter. In the next paragraph the court submits that if he had not had intercourse with her and was not the father of her child,

or they had a reasonable doubt thereof, in effect, it would reduce the homicide to manslaughter. This, taken in connection with the other charge on manslaughter, clearly and fully presented all the questions of fact to the jury which it was necessary or proper to submit to them.

Among other things, it was clearly shown that on Sunday, May 12, 1907, before the killing occurred on Monday morning of the next week, the deceased, among other things, had stated to parties that Kittie Caruth was in family way—six months gone—and that appellant was the cause of it, and that this had been communicated to appellant and specifically stated to and discussed by him as early as Wednesday following Sunday, May 12; that after all this, on Saturday morning of that week he and appellant were working in adjoining fields and that they came together at the fence between them in working back and forth; that appellant then saw deceased and that he and deceased spoke to each other; that at that time appellant was not armed and had no pistol, but that he went to Hillsboro, six or eight miles distant, on Saturday evening and bought a pistol—a sixshooter.

That on Sunday, May 19, the deceased was at the schoolhouse in which the Sunday-School was conducted; that the appellant went to Sunday-School at that time and day, but did not go into the house. The evidence tends to show, and the jury were justified in believing, that the appellant on that occasion saw the deceased, but that he said or did nothing to him and no conversation occurred between them.

That again on Sunday, May 19, the deceased repeated to another what he had said the previous Sunday about the pregnancy of Kittie Caruth and the appellant's connection therewith. That that Sunday night appellant, his cousin, Bert Caruth, the brother of Kittie, an uncle of theirs, and also their grandfather with others met at their uncle's, Mr. James, to discuss and did discuss again fully all of the statements that the deceased had made concerning Kittie Caruth's pregnancy and appellant's connection with her, and also his statements about Blanche Caruth; that after this discussion of the matter appellant was told by Mr. Wallace, one of the consulting crowd, that the whole matter was to be handled and settled by the older heads. Appellant then stated that as he had been concerned with the matter, he thought it was his duty to go and settle his part of it himself, and to others he stated he would settle his part of it himself, and he also stated to Mr. Wallace, the party who informed him of the decision of the consultation, that he was going down to see Roberson the next morning and that if he (Roberson) told him to his face what he had been telling about Kittie Caruth that he would not stand it. Just after this, when the appellant, his cousin, Bert Caruth, and Edgar Bilbry were together, leaving this place of meeting, appellant told these two that he was going down to Roberson's the next morning, and if he told him to his face what he had been telling to

Wallace and others that he was going to kill him. (Appellant in his testimony denied in effect that he made these statements.) He also stated to Edgar Bilbry that he had a gun and was a good shot, and could plug a post every time.

On a former trial of the case the appellant, himself, among other things, testified that he told Mr. Wallace "that he (Roberson) had settled the matter on me and I thought it was my duty to go and see him myself about it." (This refers to the conversation between the parties at Mr. James' house the night before the killing, when they all had met and consulted about it.)

The immediate details of the shooting and killing itself is given above in this opinion in quoting the testimony of Mrs. Roberson, wife of deceased. On this trial she testified that while appellant was doing the shooting "as to defendant's appearance and as to whether or not he appeared to be cool and collected or excited, I do not know. I could only give my judgment. He seemed to be very cool." On cross-examination she testified she thought this was the first time that she had testified appellant appeared to be cool. She also testified that she had frequently told the State's attorneys about it, and had told them in her consultations with them and talks thereabouts "that defendant appeared to be perfectly cool and determined."

The statute itself defining manslaughter requires two requisites to reduce voluntary homicide to manslaughter, to wit: "sudden passion" and that that passion "must arise from an adequate cause." If either of these requisites are lacking, the offense can not be manslaughter, but must be murder in one or the other degrees. In McKinney v. State, 8 Texas Crim. App., 645, Presiding Judge White, for this court, said: "A killing upon such sudden passion as is mentioned may be murder in the second degree, even though the passion was anger, rage, sudden resentment or terror, rendering the mind incapable of cool reflection. To make such killing manslaughter, there must actually have existed not only such state or emotion of the mind, but the *adequate cause* which produced them must also exist. Penal Code, article 782. Insulting words or gestures, or an assault and battery so slight as to show no intention to inflict pain or injury, may be sufficient to cause the emotions of the mind known as anger, rage, sudden resentment or terror, to the extent even of rendering it incapable of cool reflection, and yet a killing under such circumstances would not be manslaughter. Why? Because such insulting words or gestures, or such assault and battery, *are not adequate causes* (Penal Code, article 701), and manslaughter can not be predicated upon any voluntary homicide upon sudden passion not arising from *an adequate cause.* (Penal Code, article 698.)" This decision has been repeatedly quoted and approved on this point. See Clore v. State, 26 Texas Crim. App., 624; Hill v. State, 11 Texas Crim. App., 456; Neyland v. State, 13 Texas Crim. App., 536; Childers v. State, 33 Texas Crim. Rep., 509; Blackwell v. State, 29 Texas Crim. App., 194,

and Miller v. State, 31 Texas Crim. Rep., 639; Ex parte Jones, 31 Texas Crim. Rep., 446, and many other cases might be cited.

It is elementary that in considering the charge of the court the whole of it must be considered and taken together. It will not do to pick out here and there some isolated words or short sentences, or even one paragraph by itself and consider that alone, for when these words, sentences or paragraphs are taken in connection with the whole charge, they would not be subject even to the criticisms made against them.

In this case the appellant has done this with reference to the charge of the court. The court's charge, as a whole, very fully and amply charges on murder in the first and second degrees and manslaughter and very aptly submits all questions of fact arising under each of these questions. The charge on manslaughter, we think, is particularly full, apt and appropriate, and in our opinion there is no reversible error pointed out in any way by the appellant which would authorize or justify a reversal of this case. Appellant did not ask any special charge on any subject.

There being no reversible error in the case, the judgment will be affirmed.

*Affirmed.*

ON REHEARING.

March 27, 1912.

PRENDERGAST, JUDGE.—This case was decided and the opinion rendered herein on November 1, 1911. At that time there was no dissent from any member of the court. Within fifteen days appellant filed his motion for rehearing, presenting again the same questions that were presented, discussed and decided in the original opinion. Upon consultation, in considering the motion for rehearing, Presiding Judge Davidson indicated that he then differed with the court on some of the questions discussed and decided in the original opinion, the motion for rehearing, therefore, has not been acted upon earlier, awaiting an opinion by him on any question wherein he differed from the court. None has yet been prepared or shown us.

Upon a thorough reconsideration of the case and the questions raised, discussed and decided therein, in the original opinion, we see no occasion now for writing anything further, as we believe all the questions have been correctly decided. However, if any dissenting opinion is hereafter filed in the case, the court may or may not, as it deems best, file an additional opinion herein on whatever questions an adverse opinion may be expressed in the dissenting opinion.

The motion for rehearing is overruled.

*Overruled.*

DAVIDSON, PRESIDING JUDGE (dissenting).—This case was submitted on rehearing some time since. After a careful review of the

record and the questions suggested for revision I am firmly convinced the judgment should be reversed and the appellant awarded another trial. My brethren reached the other conclusion, and, therefore, affirmed the case. Mr. C. F. Greenwood, counsel for appellant, has filed an exhaustive brief and elaborate argument on the questions urged for reversal. I have carefully examined the questions in the light of the brief and argument, and believe that he is correct. Were I to write an opinion I would but follow the general line of thought and authority which he has mapped out and cases cited. The argument is unanswerable, and the authorities cited by him support every proposition under which they are cited, and nearly all of the cases are decisions rendered by this court. These authorities are not discussed by my brethren, but the effect of their opinion is in conflict with them, though they do not so state. Mr. Greenwood's argument is elaborate able and exhaustive, and I hereby adopt it as my dissenting opinion. I do not wish to add anything to what he has written, which is as follows:

"The appellant was charged by indictment with the murder of J. C. Roberson in Hill County, Texas, alleged to have been committed on May 20, 1907. Upon his first trial, which occurred in said county, he was convicted of murder in the first degree, and his penalty assessed at life imprisonment. Upon appeal, the conviction was reversed and remanded by this court. (52 Texas Crim. Rep., 591, 108 S. W. Rep., 365.) Subsequently, the District Court of Hill County, upon its own motion, changed the venue to Ellis County. There have been two trials in the latter county, and the present appeal is from the last trial. Appellant was found guilty of murder in the second degree, and his punishment assessed at ten years imprisonment. The questions involved were all fully presented in motion for new trial, as well as in brief and oral argument upon original submission. These are again raised in appellant's motion for rehearing.

"The deceased was about forty-eight years of age, and with his wife and children resided upon his farm, a few miles west of Hillsboro, in what was known as the 'James Schoolhouse' community. The appellant was twenty-one years of age; was reared in Goliad County, but at the time of the homicide was living with and working as a farm hand for the witness John Hooker in the same neighborhood. It appears from the evidence that he was never arrested before, and the record shows that when he offered to prove his good reputation as a peaceable, quiet, law-abiding young man, the State in open court admitted that his general reputation was good. The undisputed record shows that the killing grew out of the fact that deceased had made a number of damaging statements against Blanche and Kittie Caruth, imputing to each of them a lack of virtue and chastity. They were unmarried female cousins of appellant. They resided with their father and their brother Bert, about three hundred yards from deceased, the deceased being their closest neighbor. Their mother had been

dead several years. Miss Blanche was between seventeen and eighteen, and Miss Kittie between sixteen and seventeen years of age at the time of the homicide. The killing occurred upon deceased's premises, between nine and ten o'clock in the morning. The appellant testified that the general reputation of both girls in the community for virtue and chastity at the time of the homicide was good, and this is not a controverted issue in the case. They moved in the best social circles of the neighborhood, and frequently visited in the home of deceased. It is also an uncontroverted fact in the record that deceased and appellant were on the best of terms with each other, up to the time that deceased began assailing the character of said girls, a few days before the killing, and that appellant visited in deceased's home. The evidence shows that appellant was informed of what deceased had said about his cousins, and he testified that it greatly agitated and excited his mind, and that while in this state of mind he shot and killed deceased on account of what he believed to be slander against his cousins. Appellant interposed no plea of self-defense, but contended that he was not guilty of murder in either degree, but was guilty of only manslaughter, and this was his sole defense. The State contended that he was guilty of murder. The court submitted murder in both degrees and manslaughter to the jury.

There are a number of very interesting and vital questions involved in this appeal which can not be appreciated or correctly solved, without a clear, definite knowledge of the evidence, but with this knowledge they are of easy solution. The opinion of the court affirming the conviction does not present the questions, nor deal with them as presented by the record, in the *light* of the evidence. On Sunday, May 12, preceding the killing on the 20th, deceased and witness R. F. Bilbry were at James Schoolhouse at Sunday-School and singing exercises. The deceased and witness walked out of the house and sat down in a surrey, the deceased telling witness he wanted to talk to him. Witness testified, among other things, that deceased said to him:

'Things were going on a little bad up at Caruths; he said there was a gang of boys around there all the time, and said that I had a boy that was going there some, and he said, I feel that it is my duty, as a neighbor and as a friend, to tell you about it, and he said that Kittie Caruth was in a family way, and was six months gone, and I asked him, "My boy is not having nothing to do with Kittie Caruth, is he?" and he nodded. He says, "He is paying attention to Blanche, Kittie's sister," and I asked him, I says: "Is *both* girls being talked about?" and he says, "Yes;" and I asked him if "Wess Holmes had not skipped the country?" and he said that he had, and he said that Arthur Redman was too familiar with the *Caruth girls.*"

It appears from the record that these were the first statements deceased made against the girls, and this was eight days prior to the killing. It might be stated here that Wess Holmes was a cousin of deceased's wife, was a single man, and had been in the neighborhood

for something over a year, having come from Arkansas. He had been gone from Hill County just two days when deceased made said statements. Late in the afternoon of the day on which the above conversation occurred, deceased and wife went to the home of the witness W. A. Wallace, who lived a few hundred yards east of deceased. Wallace testified that he and deceased walked out in the garden, and while there deceased asked the question:

'If I had heard the news, and I asked him what news? He said that Kittie Caruth was in a family way, and asked me if I had heard it, and I told him I had not. He said it was a common fact, and was positively so, and said that Wess Holmes, a relation of his, had left the country on account of it, and that he thought the charge was laid to Arthur Redman, and that it would be well for him to leave the country, if he wanted to avoid trouble.'

Witness testified the deceased said: 'Mr. Caruth was a very vicious, drinking man, and that defendant would possibly get in trouble with Mr. Caruth.'

This was the second time in point of chronological order that deceased made derogatory statements. Witness testified that on the following 'Wednesday or Thursday' he saw appellant while plowing in Mr. Hooker's field, and related to him what Roberson, deceased, had told him. Witness testifying on this point, said:

'I told him that he was accused of being the father of a child that was to be born to Kittie Caruth, according to Mr. Roberson's statement, and that Wess Holmes had already left the country, and that Mr. Roberson had advised that he leave the country; that it would be best for him to leave the country. I told him that Roberson had said this. He stated to me that so far as he was concerned, he was innocent. I believe the words he used were, that it was a damn lie; that he would investigate it, and said he did not believe it *as* to the *girl*.'

This was the *first* time that appellant heard of any statement made by deceased against either of his cousins, and this information imparted to him involved only *Kittie Caruth*. He had not yet been informed of any statement against Miss Blanche.

The testimony of the witness John Hooker, whose farm was just east of deceased's farm, shows that on the following Saturday morning, two days prior to the killing, that witness and deceased engaged in a conversation at the dividing fence. Appellant was plowing in Mr. Hooker's field at the time. Among other things, witness states:

'I saw the deceased, John Roberson, about eight o'clock in the morning. We met at the dividing fence. A conversation began about the crops in general, and so on, and in the run of the conversation I asked him if he thought the report on Kittie Caruth, living near him, was true, and he said, "I reckon so," and went on to say that Kittie Caruth had told his wife that her *monthly periods* had stopped on her, and asked her as to what she should do about it, and that in

November that her sister Blanche had gone to his wife (Mrs. Rober-son) about it, and had told his wife that she was afraid that her sister was in a family way, and that that was what was the matter with her, and he (Roberson) said that his wife told her that if she thought that was what was the matter that she ought to talk to her about it, as she was her sister, and the person to talk to her about it, as she had no mother.  He said that when she talked to her about it, that Kittie said it was not true, that she was not in a family way, and Mr. Roberson said, "She looks like it to me."  I asked Mr. Roberson then who was suspicioned in the matter, and he said, "That boy," and nodded his head in the direction of Redman, who was plowing in the field.  "That boy, or Wess Holmes;" that Wess Holmes had left the country, which made suspicion point to him.'

Mr. Hooker's evidence at another point shows that Roberson was on one side of the fence and that witness and appellant were on the opposite side.  Appellant heard no part of the conversation, and as appellant plowed by he and deceased said 'Good-morning' to each other.  This was the first time that appellant saw deceased after Wallace had told him of Roberson's charges; and because appellant did not kill him on this, the 'first meeting,' the prosecution claimed he was guilty of murder.  Up to this time appellant had not heard of any slanderous statements against his cousin, Blanche.  He had not heard of *all* the statements that deceased had made as to *Kittie*.  He had not yet seen Kittie Caruth.  He had told Mr. Wallace that he believed Kittie was innocent, and that he 'was going to investigate it.'

In view of the charge of the court it is important to discover what knowledge came to appellant between the 'first meeting' and the time of the homicide, because this has a vital bearing on appellant's legal rights, and upon the charge of the court.

Sam James, an uncle of said girls, testified: 'That some time during the week preceding the killing on the following Monday, he met deceased in the road, and that deceased told him that Kittie was in a family way, and six months gone, and charged that Arthur Redman was the "daddy of it," and that Wess Holmes had left the country, and that Mollie (his wife) had told Wess that he had better open his eyes, and he said Wess was gone, and had left no trace.  He said that the boys were going there on rainy days and Sundays, and said, "You know how it is when anything is loose in the country." He said that Wess Holmes, Arthur Redman, Ed Bilbry and Alex Hooker were going there.  He said Blanche told Mollie (his wife, Mrs. Roberson), that her father came home drunk one night and wanted her to sleep with him, and told her to lie down on the bed with him until he went to sleep, and that she laid down on the bed there with her father, and her father commenced feeling of her breast, and that

she got up and left. He said that Blanche had told Mrs. Roberson this.'

Let it be remembered that appellant knew nothing of these charges made to Mr. James at the time he saw deceased in Hooker's field. Appellant testified that he learned of said conversation on Sunday night before the killing, next morning. The witness Sam James testified that on said Sunday night:

'I told Mr. Wallace in the defendant's presence what Roberson had told me, and I told him that Roberson had told me that Kittie was six months in a family way, and that Arthur Redman was the daddy of it.'

On Sunday, the 19th of May (one day before the killing), deceased and R. F. Bilbry met again at the schoolhouse; deceased then asked Bilbry if he had told his (Bilbry's) folks what he (Roberson) had told him on the previous Sunday, and Bilbry said:

'I told him I did; that I had a talk with Edgar (his son) the next morning . . . and he said that was alright, but he said, "Bert Caruth tackled me for the talk I made out there awhile ago, and I told Bert that this was *no place for talking,* and he said, "I just wanted to know how to meet it." '

This was the evening before the killing. The evidence shows that late Sunday evening, appellant went to the Caruth home and had a talk with Kittie Caruth, in the presence of her sister Blanche and brother Bert. Appellant testified: 'I went home with Bert that evening; I went up there to find out about this report; when I got to the house I saw Kittie and Blanche there. . . . Bert Caruth was present at the time. Kittie said that Roberson was just telling that to try to ruin her in the neighborhood, and that she didn't like it, and said it was a lie.' Upon recross-examination, Kittie Caruth, who testified as a State's witness, admitted that late Sunday evening, before the killing next morning, appellant talked to her, and, among other things, she testified: 'It was late Sunday evening; Blanche and Bert were both present. Arthur told me that he heard about what Roberson was saying about me, and he asked me if there was *any truth* in it. I told him it was a positive lie, and I told him that John Roberson was simply trying to ruin me in the community.'

It should be remembered that when Wallace informed appellant on preceding Wednesday of said charge by deceased against Kittie Caruth, appellant said he was innocent and that he believed the girl was innocent, and that he was going to investigate it. He did not have this assurance from her at his 'first meeting' with deceased, because he had not seen her. After seeing and talking with said cousin, which was between sundown and dark, appellant went to the home of the witness W. A. Wallace. We will now deal with what occurred on said night, prior to the homicide next morning. Wallace testified:

'The defendant was at my house that night from fifteen to thirty minutes, and Bert Caruth and Edgar Bilbry were with him. When

defendant came in the house I asked him to be seated, that I was busy at the phone, and could not talk to anybody, and he made the statement "that I had never told him anything that *compared* with what was told him that evening.' . . . While he was at my house that night before I went to Captain James, he seemed to be restless and did not keep his seat long; he was up, and attempted a time or two to talk to me, and I asked him to be seated, and he finally got up and went out on the gallery.'

What had he learned *that night* that caused him to say to Wallace, 'You have told me nothing, compared with what I have heard to-night?' We shall see. Edgar Bilbry's cross-examination upon a former trial was reproduced by appellant. He had testified as a State's witness upon such former trial, and died subsequently. He testified: 'Up at Mr. Wallace's that night (night prior to killing) Mr. Wallace asked me who told me that I had been going to Caruth's at night, and in answer to Mr. Wallace's question, in the defendant's presence, I told him that my father told me, and the defendant heard this.' Upon redirect examination he stated: 'On Sunday night before the killing, while I was with Mr. Wallace and Arthur Redman on the porch, I told him that my father was told by John Roberson that it was talked around that I was slipping around to Caruth's at night and going in his house at night.'

As to this conversation at Wallace's on the Sunday night in question, the appellant testified: 'Edgar Bilbry told me that night that Roberson had also been talking about Blanche Caruth and him, and had accused him of slipping in, and of sleeping with her at night, and that I had been running a regular whore house there ever since I came to Hill County. That statement was false. I never carried anybody to my uncle's house for immoral purposes, and I had never seen any act of prostitution there, and I had never seen anyone take any liberties with either one of the girls. The girls were just like sisters to me, since I had been there.'

The witness W. A. Wallace and witness Claud Wallace both testified to the restless, agitated condition of appellant at said time and place. After this conversation at Wallace's the appellant, Bert Caruth and Edgar Bilbry left for the purpose of going to Captain James' residence. He was the grandfather of the girls. The witness W. A. Wallace followed them in a few minutes. Sam James was awakened and then Captain James. Captain James, W. A. Wallace and Sam James discussed the situation to themselves. The witness Edgar Bilbry, in detailing what took place then, testified:

'I remember that Bert Caruth made the statement over there, while the matter was being discussed, that he had already investigated Roberson's talk, and that his sister was innocent, and that there was no use to investigate it any further. The defendant seemed restless and bothered, and was walking around, backwards and forwards; defendant remarked: "There's them poor girls; they are motherless and

haven't much of a father, and Roberson has thrown out this talk against them, and has ruined them." He said he felt like the girls were sisters to him, and I noticed that defendant was crying, and I heard him say that he was going to Roberson and talk to him like a gentlemen and try to get it straightened out peacefully. He said he was going down to see Mr. Roberson next morning, and would talk to him like a gentleman, and would expect Mr. Roberson to treat him as a gentleman. I heard Bert Caruth say that Robertson's statements were false.'

W. A. Wallace, in testifying as to what happened there, stated: 'My business with Captain James was to talk over the report. While all this was going on the defendant was walking up and down the road in front of the mail box; sometimes he was sitting down and sometimes walking; would sit down a minute and then get up and walk; he was walking up and down the road and appeared restless. . . . I saw the defendant and Sam James together near Mr. James' house that night at the time I have already testified about, and they were having a conversation about the report.'

The witness Sam James in testifying about said occasion, stated: 'Defendant seemed restless that night. When I first went out he was sitting down on a box, with his head down; then he got up and walked around two or three times; the other boys were standing there. I told Mr. Wallace, in defendant's presence, what Roberson had told me.'

Mrs. John Hooker, at whose home defendant lived, testified that during the latter part of said week she noticed the unnatural, restless condition of defendant, and that he lost his appetite.

Appellant, testifying as to what happened at Mr. James' premises on said night, stated: 'Captain James and Sam James and Mr. Wallace went off to one side and had a talk, and then came back where we were, and Captain James told us that they had decided to let older heads settle this, and I told them that Mr. Roberson had connected me with it, and I thought it my place to go and settle it myself, to go and see him next morning. I heard *there that night* that Mr. Roberson had told Sam James (I think it was Sam James doing the talking) that Roberson had told him that ever since I had been there I was gathering up the boys on rainy days and Sundays and carrying them in to my uncle's, and that he knew how everything was when there was anything loose in the neighborhood. There was nothing else talked that night down there, except the slanderous reports about *those girls*. Bert Caruth told us that night that he had investigated it, and found out that there was not anything wrong with the girls, and that he was willing to go to Mr. Roberson and see that he straightened it up. Bert Caruth was talking to me at the time, and I had confidence in what he said. No one that night claimed that the slanderous reports were true, and I

had not heard of anyone claiming they were true, except Mr. Roberson.'

The appellant testified that next morning he and Bert Caruth went together to see deceased about said reports. Appellant testified that he was torn to pieces over it, and had been in an excited, 'torn-up' condition several days over it, and that fearing he could not control himself, he asked Bert Caruth to do the talking when they should reach Roberson. Appellant's version of what then transpired is as follows:

'When we got to Mr. Roberson's he was plowing in the field; we went down the road to where he was plowing and he drove out to the end and stopped, and I believe turned his team around, and I went up and spoke to him and Bert said to him: "Mr. Roberson, we came over this morning to talk to you about the report you have been making about my sister," and Mr. Roberson says, "Alright," and Bert asked him why he had made these reports. He said he had told two men about it, Mr. Bilbry and Mr. Wallace, and told it because it was true, and ought to be told, and that he did not know then but what it was true. Mr. Roberson did not make any offer to investigate and try to find out about it. He seemed to be very angry about it, very hot, and we were some six or eight feet apart. When he made that charge I told him that when he said he didn't know but what it was true, I said that any man that said that girl was in a family way was a lying son-of-a-bitch, and he started towards me, and I shot at him when he started towards me. I don't know how many times I shot then, or how many times I shot in the seed house. I was excited so, I do not remember how many times I shot. I believed that his statements were false. I had no suspicion at that time that the girl was in a family way, and did not know it, and I had no suspicion at all that either one of the girls had been guilty of any immoral conduct.'

Upon cross-examination he testified that deceased spoke of 'both girls.' He further stated: 'I had heard of him talking about both of them before the shooting, and I had been told by Sam James and Ed Bilbry, and I believe Mr. Wallace, and I am as positive that they told me Mr. Roberson was talking about Blanche as I am about any other fact.'

From this somewhat lengthy statement of the evidence the following facts are shown to have been in evidence: First: That Blanche and Kittie Caruth were first cousins of appellant. Second: That deceased uttered insulting remarks about both of them. Third: That on Wednesday or Thursday preceding the shooting, appellant was informed by Wallace that Roberson had charged that Kittie Caruth was in a family way, and had accused appellant of being the author of her pregnant condition. Fourth: That on following Saturday the appellant saw deceased and did not kill him. Fifth: That at the time of said 'first meeting' with deceased appellant had

not been informed of any slanderous statements against his cousin Blanche, and had not seen Kittie. Sixth: That late Sunday evening (prior to homicide next morning) he saw her, and she assured him of her innocence, and said that Roberson's statement was a *positive lie.* Seventh: That on Sunday night he was informed that deceased had been *repeating* said statement against Kittie Caruth to others besides Mr. Wallace, and had been making serious charges against Blanche, imputing to her a lack of chastity and virtue, and had charged in substance that the home of said girls was like a 'whore house,' and that appellant was guilty of carrying the boys there for immoral purposes, and that deceased had made specific charges of unchastity against Miss Blanche, in connection with Edgar Bilbry. Eighth: That appellant was agitated, restless and excited on said night on account of said charges. Ninth: That appellant was restless and excited when he and Bert Caruth met deceased at time of the shooting. Tenth: That deceased then and there admitted that he had been making said statements, and then reaffirmed and repeated same, and that appellant then began to shoot and killed deceased, and there is evidence that appellant's mind was highly inflamed at the time.

With the foregoing statement of the facts in evidence kept in mind, it should not be difficult to solve the legal questions involved.

The charge of the court, in our judgment, contains a number of serious errors. In paragraph 18 of the charge, the court in submitting manslaughter instructed the jury as follows: 'By the expression "adequate cause" is meant such as would commonly produce a degree of anger, rage, resentment or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection. *In this connection* you are charged that insulting words of the person killed toward a female relation of the party killing is "adequate cause," *provided* the killing occurs *immediately* upon the uttering of the insulting words, *or so soon thereafter* as the party killing may *meet with* the party killed *after* having been informed of such insulting words.'

It will be observed that this paragraph makes 'insulting words towards a female relation of the person killing' adequate cause *only* in the event the killing occurs immediately upon the uttering of the insults or so soon as the party killing may *meet* with the party killed, *after* having been informed of such insulting words.

In further submitting the issue of manslaughter, the court charged as follows, in paragraph 20: 'When a killing results because of insulting words toward a female relative, which have been communicated to the party doing the killing, the *mere lapse* of *time* between the formation of the design to kill, and the killing is immaterial, provided the design was formed when the mind was inflamed by passion which rendered it incapable of cool reflection, by reason of such insults, and such condition of mind existed at the time of the

killing; *provided,* the killing was at the *first meeting* with the party who had uttered the insulting words, *after* the party killing had been informed thereof. In determining the condition of the defendant's mind at the time of the killing, you should consider all the facts and circumstances in evidence before you. If you believe the defendant killed the deceased (if he did) because of insulting words by deceased towards Kittie Caruth or Blanche Caruth, both or either of them, and that the killing occurred *immediately* upon the *uttering* of such insulting words, or at the *first meeting* with deceased after defendant had been informed thereof, etc., he would be guilty of manslaughter.'

It will be seen that in *three separate* paragraphs the court announced to the jury that the killing must occur *immediately* upon the uttering of the slanderous words, or upon the *first* meeting with deceased, in order to reduce the homicide to the grade of manslaughter.

Stated in another form: The jury could not convict defendant of manslaughter, unless the killing happened when the insulting words were spoken, or upon the *first* occasion when defendant met deceased after hearing of said insults. Under this charge the jury could not convict defendant of manslaughter, because, in the first place, defendant was not present when deceased uttered said words. Second, because he did not kill him on 'first meeting,' and therefore under these paragraphs of the court's charge the jury had no option except to convict of *murder.* The charge of the court in the particulars stated is erroneous and not applicable to the evidence. The error is a serious one and upon a vital point in the case.

The undisputed record shows that up to the time that appellant had his 'first meeting' with deceased he had only been informed that deceased had charged that Kittie Caruth was in a family way, and that appellant was the author of her alleged pregnant condition. It was *after* this that he was informed that deceased had charged in substance that the Caruth home was like a whore house, and that *appellant* was carrying a gang of boys there on rainy days and Sundays. He was also informed that deceased had attacked the character of Blanche Caruth, and had charged that Edgar Bilbry was slipping in and staying with her. All this information came to appellant on Sunday night preceding the killing next morning. Besides this, he had not seen Kittie Caruth at time of 'first meeting' to ascertain what she might have to say about said report as to her. She admits that on Sunday evening she assured appellant that she was innocent of the charge, and that she stated to appellant that Roberson's statement was a *lie,* and that he was simply trying to ruin her in the neighborhood. After said 'first meeting' the brother of said girls told appellant that he had investigated said matter, and that deceased's statements were false. In addition to all this, the evidence shows that at the time of the killing the deceased, in a manner some-

what defiant and emphatic, admitted in appellant's presence that he had been making said statements.

This court has laid down the principle in a number of cases that even though the killing does not occur at 'first meeting,' yet, if deceased continues to *repeat* the insulting statements, or makes new or additional insulting remarks towards defendant's female relatives, or admits to defendant that he had made such statements, that in such instance *each* of said statements (communicated to . defendant) is a *new* and *fresh* provocation, and constitutes 'adequate cause.' This would be a sound proposition of law even if no court had ever announced it. It comports with reason and human experience, and is in harmony with the almost universal experience of men in a civilized state everywhere. The statutes of legislative bodies and the decisions of courts of last resort upon manslaughter, growing out of insulting remarks or conduct towards the female relatives of a man committing homicide, as a result of same, are but a recognition of the laws of human nature that animate and move the minds of men everywhere. But the question as to whether the charge of the court is error is not an original proposition, but has been repeatedly decided by this court: Richardson v. State, 28 Texas Crim. App., 216; Venters v. State, 47 Texas Crim. Rep., 280; Tucker v. State, 50 S. W. Rep., 711; Floyd v. State, 46 Texas Crim. Rep., 533; McAnear v. State, 67 S. W. Rep., 117; Akin v. State, 119 S. W. Rep., 863; Melton v. State, 83 S. W. Rep., 822; Holcomb v. State, 54 Texas Crim. Rep., 489; Young v. State, 54 Texas Crim. Rep., 423; Barbee v. State, 58 Texas Crim. Rep., 129; Maxwell v. State, 56 S. W. Rep., 62; Bays v. State, 50 Texas Crim. Rep., 548; Canister v. State, 46 Texas Crim. Rep., 223; Stewart v. State, 52 Texas Crim. Rep., 283.

If the principle announced in these decisions is sound (and of its soundness the decisions leave no doubt), then it inevitably follows that the three paragraphs in the court's charge, requiring that the killing must occur at 'first meeting' in order to reduce to manslaughter, when there is evidence of new, additional and fresh provocation, a repetition of the first insults, and then a reiteration of same by deceased to a defendant, is such a fatal error as to demand a reversal.

This error in the court's charge was intensified by paragraph 17 of the charge, in which the court instructed the jury that: 'By the expression under the immediate influence of sudden passion is meant that the act must be directly caused by the passion arising out of *the provocation.*'

The tendency of this was calculated to lead the jury to believe that the court meant that there was but one provocation, whereas the evidence showed a number of provocations, and it is the law that all of them should have been considered and taken into consideration, and especially as *intensifying* the one given at the imme-

diate time of the homicide.    Orman v. State, 24 Texas Crim. App.,
503; Martin v. State, 40 Texas Crim. Rep., 666; Freeman v. State,
46 Texas Crim. Rep., 322; Manning v. State, 48 Texas Crim. Rep.,
57; McHenry v. State, 54 Texas Crim. Rep., 479; Reinhardt v.
State, 133 S. W. Rep., 265.

Although these errors were specifically pointed out in motion for
new trial, and discussed in appellant's brief, they are not even *referred to,* must less discussed, in the opinion affirming the conviction.

In paragraph 21 the court charges as follows: 'If you believe
from the evidence, beyond a reasonable doubt, that before the homicide the defendant had had sexual intercourse with *Kittie Caruth,*
and was the father of a child subsequently born to her, *and* you
further believe from the evidence, beyond a reasonable doubt, that
defendant killed deceased (if he did) *not* because or *partly* because of
insulting words uttered by deceased towards Blanche Caruth, but
solely because of what deceased may have said imputing a want of
chastity to Kittie Caruth, then in such event the homicide would
not be reduced to manslaughter, although the defendant had been
informed that deceased had stated that Kittie Caruth was in a
family way and six months gone, and that defendant was the father
of the unborn child, and even though deceased had repeated said
statements or admitted that he had so stated in the presence of the
defendant at the time of the killing.    If, *however,* you believe the
defendant *had not had* sexual intercourse with said Kittie Caruth
(of if you have a reasonable doubt as to whether he so had), and
you should further believe that prior to the homicide defendant had
been informed that deceased had used insulting words imputing a
want of chastity to Kittie Caruth or Blanche Caruth, both or either,
*and* subsequent thereto he met the deceased, *and* did not act on the
information he then had, *but* that after such meeting or meetings
(if any) he was informed of further insulting words that deceased
had used towards said Kittie or Blanche Caruth, both or either, *and*
the defendant acted upon such information *and* killed said J. C.
Roberson as soon as he met him, after having been informed of such
additional insulting words (if he was so informed) *and* that such
additional insulting words (if any), either alone or in connection
with the words of which he was first informed, were the cause which
induced defendant to kill deceased, *and* by reason thereof his mind
was inflamed to such a degree as to render it incapable of cool reflection, *then* same would be adequate cause,' etc.

The evidence showed that deceased coupled not only appellant's
name with the pregnant condition of Kittie Caruth, but also the
name of Wess Holmes.    He had charged that the Caruth home was
like a 'whore house,' and that a 'regular gang of boys were going
there on rainy days and Sundays,' and said to Sam James, an uncle
of the girls, 'You know how it is when there is anything *loose* in

the country.' The court in charging on defendant's rights as to manslaughter, in connection with deceased's insulting remarks as to Kittie Caruth, ignored all said matters, whereas they would have constituted adequate cause, even though appellant had had sexual relation with said girl. Unquestionably, if defendant was informed that deceased had made said statements, this would constitute 'adequate cause' *independent* of deceased's charge connecting appellant's name with Kittie's. But this feature of the case was lost sight of by the trial court and by this court.

There is a still more glaring error, one that is perfectly manifest on the face of the charge. In said paragraph the court places a restriction and limitation as to the right to kill on account of slanderous words against *Blanche* Caruth, in that he puts it upon the condition that:

'If, *however*, you *believe* the defendant *had not had sexual intercourse* with said Kittie Caruth, and you should further believe that prior to the homicide defendant had been informed that deceased used insulting words imputing a want of chastity to Kittie or Blanche Caruth (both or either) *and,*' etc., etc., etc., and the conjunction '*and*' runs throughout said paragraph.

In other words, the court made such fact, that is, that appellant '*had not* had sexual intercourse with *Kittie Caruth,*' an *absolute condition precedent* to a manslaughter verdict, even though the killing resulted from the slanderous statements as to *Blanche* Caruth.

Insulting remarks as to Blanche constituted 'adequate cause,' *independent* of Kittie Caruth's connection with the case. Of this there can be not the shadow of doubt. The *statute* itself would settle that question.

Under the instruction complained of the jury were not authorized to reduce the offense to manslaughter, unless the evidence showed that appellant '*had not* had sexual intercourse with Kittie, even though they believed that the killing resulted *entirely* or *partly* on account of the insulting remarks against *Blanche* Caruth. This is not the law, and in the very nature of things can not be. It overrides the statute on the subject, and is subversive of the very principles underlying the statutes on adequate cause and manslaughter. The court should have charged on 'adequate cause' as to slanderous statements against Blanche Caruth, without any *limitation whatever* as to whether appellant had sexual relation with Kittie Caruth, and should have done so by an *independent paragraph.*

The court should also have instructed the jury in appropriate, definite language that *even* if the jury believed that appellant had had carnal intercourse with Kittie Caruth, *still* that if they believed from the evidence that appellant killed deceased on account of insulting remarks towards *both* said girls, that nevertheless this would be 'adequate cause,' although the killing was partly on account of the remarks as to *Kittie Caruth,* and the charge as to these matters

should have been in direct *affirmative* form, and not in a negative way. These errors, although of a patent, flagrant nature, and upon the most vital issue in the case, are not even discussed in the original opinion affirming the conviction. How this court can afford to approve the court's charge, in said particulars, in the face of the statutes and the decisions of this court, is inconceivable to our minds. The court, in affirming this case, does not discuss these glaring errors, but says:

'It is elementary that in considering the charge of the court, the whole of it must be considered and taken together. It will not do to pick out here and there some isolated words or short sentences, or even one paragraph by itself, and consider that alone, for when these words, sentences or paragraphs are taken in connection with the whole charge, they would not be subject even to the criticism made against them. In this case the appellant has done this with reference to the charge of the court.'

We say that a charge should be measured as a whole. But surely the errors in a charge should be pointed out specifically. What good would it do to place in a brief or motion for new trial an entire charge, and especially those parts free of error? The rule is to point out those parts that are erroneous, and this we did fully in motion for new trial, in briefs and in motion for rehearing. We have shown that by repetition in *three separate* paragraphs the court required the killing to be on 'first meeting' in order to reduce to manslaughter. This can not be denied. In this connection we have shown by an unbroken line of authorities that the court's charge in said particular is not the law, under such a state of facts as is disclosed in the record. We have shown that said error was intensified by previous paragraphs of the charge requiring that the 'act must be directly caused by the passion arising out of *the provocation,'* and that the inevitable effect of this was to create upon the mind of the jury that the court was limiting the passion and adequate cause to only *one* provocation, and we have shown that this is not the law where there are several provocations, all of which should be considered by the jury as intensifying the provocation and passion. But it may be said that although these errors are on the face of the charge, yet that in paragraph 21 the court cured same by charging on the *several* provocations, and submitted manslaughter based on insults, at a subsequent 'meeting.' It is a sufficient answer to say that a charge containing *independent* paragraphs on the *same* subject in *direct* and *irreconcilable conflict* with each other, on a material issue in the case, can not be permitted to stand. It would be impossible to know *under which* of conflicting paragraphs a jury decided a case.

But over and above this, the court in said paragraph 21 made it impossible for the jury to give the appellant a manslaughter verdict,

even though appellant killed deceased on account of what he said as to *Blanche* Caruth, *unless, first:*

'You believe the defendant *had not* had sexual intercourse with Kittie Caruth.'

The charge of the court is fatally erroneous and marks a dangerous innovation upon the jurisprudence of this State. It is utterly at warfare, not only with sound philosophic principles which have become deeply inbedded in our jurisprudence, but the charge of the court, in effect, nullifies the statutes of the State upon *'adequate cause'* and *manslaughter*.

The evidence showed that the night before the homicide the appellant, after expressing his esteem for said girls, said that he was going to see Roberson next morning about the reports he had circulated on them, and said that he 'was going to talk to him like a gentleman, and would expect Roberson to talk to him like a gentleman,' and expressed the hope that the matter could be 'settled peaceable,' and that as Roberson had connected his name with the matter, he considered it his duty to see him, etc. Under the law, the appellant had the right to seek Roberson for an explanation, and any self-respecting man, circumstanced as appellant was, would have felt the same way. The court should have charged the jury that appellant had such right, and in appropriate language should have instructed the jury that he had a right to arm himself, and seek the deceased for an explanation. Failure to so instruct the jury was raised by appellant as error. Melton v. State, 83 S. W. Rep., 822; King v. State, 51 Texas Crim. Rep., 208; Gant v. State, 55 Texas Crim. Rep., 285; Stacy v. State, 53 Texas Crim. Rep., 461.

During the trial of the case the State proved by the witness Bilbry, over appellant's objections, that deceased was 'assistant superintendent of the Sunday-School.' The bill of exceptions in reference to this matter affirmatively shows that defendant had made no attack on the character or reputation of deceased. According to a statement placed on the bill by the court, it appears that the theory of the State was that defendant was near the schoolhouse at the time, and that deceased was on the inside of the building attending Sunday-School, and it seems that the court admitted this evidence on the theory that appellant may have seen deceased on inside, through the open window, and that this was a 'meeting' with deceased. The bill shows that appellant did not go in the house, and that *no witness* claimed that appellant saw him, and the bill recites that defendant testified that he did *not* see the deceased. It is fundamental in Texas that the prosecution can not prove the character or reputation of the deceased unless the defense has first attacked it. The prosecution had the right to prove that defendant saw deceased, and as evidentiary of the theory that he may have seen him, it was competent to prove that appellant was near by and that the windows were open or raised. It would have been proper to prove that de-

ceased was at or near an open window or walked about in the house, but proof of the fact that he was an assistant superintendent of the Sunday-School would not aid the jury in determining *whether* appellant saw him. His movements or position could have been described, without placing before the jury the fact that he was an official. Proof that he was a preacher, elder, deacon or a good man would have been just as improper. The evidence complained of was illegal, incompetent and prejudicial to the rights of appellant. It was reasonably calculated to prejudice the jury against defendant and create a sympathy for deceased, and was an indirect way of placing before the jury the standing and character of the deceased, though done in a *covert manner*. This court in passing upon this error did not confine itself to the bill, but quoted testimony from the statement of facts. This court, in an unbroken line of decisions, has held that a bill of exceptions must be determined by its own recitals, and that the statement of facts will not be looked to for the purpose of aiding or contradicting the bill, and there is no reason why this well established rule should be deviated from in this instance. (White's Code Criminal Procedure, pages 557, 558.) If it be permissible, however, to consult the statement of facts, then it is respectfully suggested that this court did not quote all, nor the most material part of Mr. Bilbry's evidence. He testified:

'I went on in the schoolhouse. I think the deceased was in the house when I went in. The windows and doors of the house were open, and it was a small house, about 20 x 40. I suppose there were fifty or sixty people there. . . . If defendant ever came in the house, I don't remember it, and I don't remember seeing him after I went in, nor after Sunday-School. Neither do I remember seeing him after the conversation with Roberson. . . . When I saw defendant on the Sunday in question he was *out* about the well, some twenty or twenty-five *steps* from the house, and I have no recollection of seeing him in the house.'

This testimony is entirely omitted from the opinion. But whether appellant saw deceased or not, the fact that he was 'assistant superintendent of Sunday-School' should not have been admitted.

The next bill relates to the action of the court in permitting Kittie Caruth to bring her young infant into court, in the presence of the jury. It might be here stated that about three months after the killing she gave birth to said baby, and upon the trial of defendant testified that he was its father. The bill shows in substance that defendant by motion presented to the court alleged that she might undertake to bring said baby into the presence of the jury, and have it with her when she would take the witness stand, and the defendant objected to same, because such a proceeding would be illegal, incompetent and prejudicial to defendant, and that the infant was too young to be considered by the jury on the question of resemblance. The trial court evidently knew that these objections were well taken, be-

cause he sustained the motion. However, it appears from said bill that during the progress of the trial the State recalled her to the stand, and that she came into the courtroom with said baby in her arms. That defendant's counsel immediately approached the court, and, in a voice that could not be heard by the jury, called the court's attention to what was transpiring, and asked the court to have the baby sent out; that notwithstanding this, the court took no action, and she went on the witness stand and testified 'with the baby in her lap, in the presence and in full view of the jury.' The bill recites, among other things, the following facts:

'The State contended that defendant was the father of *said infant,* and that defendant swore that he had never had any carnal intercourse with said Kittie Caruth, and that he was not the father of it, but that another man was its father. The leading issue upon the trial was as to the paternity of said child.'

The bill shows the utmost *diligence* on the part of appellant in attempting to prevent this illegal proceeding: He presented a preliminary motion in absence of the jury, and then again, when the orders of the court were about to be violated, he promptly called the court's attention to the fact that the infant was then being brought into court, all to no avail. This court has repeatedly held that evidence as to resemblance on part of an infant to the accused defendant is not admissible. Barnes v. State, 37 Texas Crim. Rep., 320; Kilpatrick v. State, 39 Texas Crim. Rep., 11; Hilton v. State, 41 Texas Crim. Rep., 190; Gray v. State, 43 Texas Crim. Rep., 300.

The Barnes case was for seduction; the Kilpatrick case was for incest; the Hilton case was for adultery, and the Gray case was a prosecution for rape. To the same effect are Hanawalt v. State, 64 Wis., 84; Danforth v. State, 48 Iowa, 43.

These cases involved the question as to the paternity of a young child. The following authorities hold that in such instance the jury must not have any 'visual inspection of the child.' In other words, where its paternity is in *issue* it must not be brought into the presence of the jury. Risk v. State, 19 Ind., 152; Overlock v. Hall, 81 Maine, 348 (17 Atl. Rep., 169); Gaunt v. State, 50 N. J. L., 490; Reitz v. State, 33 Ind., 187; Benes v. People, 121 Ill. App., 103.

These decisions are founded on the fact that a young infant should not be taken as a standard of comparison. Its features, the color of its eyes and hair, may undergo a radical change with the passing of months or years. In the case at bar the very charge of the court as to the *paternity* of this child, and the bills of exception, the statement of facts, as well as the charge of the court, *all* conclusively show that the trial and the verdict of the jury were made to revolve around the one central, pivotal, overshadowing issue, as to the paternity of the child. This infant was brought right into the presence of the jury. The jury had ample opportunity to look at it; to study its features, and to observe the color of its eyes, hair and its general ap-

pearance, and then to silently, but effectually, compare it with the appellant who had helplessly, through his counsel, sought by all legitimate means to forestall and prevent this condition. All the facts and circumstances of this case suggest that this was damaging. Another fact lends probative force to all the objections urged against this occurrence, and that is this: Defendant and Kittie Caruth were *first* cousins, and the infant could have naturally borne a resemblance to him, resulting from the mysterious laws of nature, and yet he not be its father. This court might *speculate* as to what conclusion the jury reached as to whether the child favored defendant or not, and as to whether it could resemble him on account of the same blood coursing the veins of its mother, and appellant, by reason of family ties, and yet he not be its father, but why speculate and conjecture when dealing with human life and liberty. Is it not enough to know that the proceeding complained of was illegal and prejudicial to appellant's rights, and that he was convicted not of manslaughter, but of murder in the second degree with double the minimum punishment fixed as his penalty? This court in its original opinion does not discuss this important matter at all, but merely says, 'There is no reversible error shown by this bill.'

The trial court placed an explanation on the bill to the effect (1) that if he had sent the baby out, this would have called the jury's attention to it, and (2) that the *incident* was not argued to the jury. In the first place, he could have had the sheriff escort the woman and baby back out of the courtroom as she was coming in, and in that event the jury would have had no opportunity to inspect the child, or he could immediately have sent the jury out, without stating why, and then could have instructed Kittie Caruth to carry her baby out of court, and then have had the jury brought back. As to the statement that the *incident* was not argued to the jury, the court did not mean that State's counsel did not contend that appellant was the father of said child, for the bill shows they did so contend, and *various bills* show that she swore that defendant was its father, and this bill and others recite 'that the overshadowing issue in the case was as-to the paternity of *said infant.*' What the court in said explanation means (and it is easily discoverable) is that State's counsel did not call the attention of the jury to the fact that the baby had been brought into court, and *profert made of it,* and in this sense, the explanation is true. But this is no answer. Certainly, this court does not mean to lay down the rule that if damaging, illegal and prejudicial evidence is introduced against a defendant, that it becomes *harmless* error when it appears that the same was not argued to the jury. Such a proposition means that *arguments* have more influence with a jury than *evidence,* and that it would not be error unless argued to the jury. It *was* argued from beginning to end that appellant was the father of said child, and it was not necessary to argue said '*incident*' that the child was brought into court. Does this court mean to overrule the

authorities cited on this question? Does the court mean to place the seal of its approval upon this proceeding, or does it mean to say that the judge's explanation rendered harmless an error that otherwise would have been palpable? That this error should call for a reversal is, to our mind, too plain to admit of any doubt.

The next bill of exceptions shows, among other things, that:

Deceased had charged that Kittie Caruth was in the family way; that defendant was informed that deceased had charged that Wess Holmes or Arthur Redman (defendant) was the father of her then unborn child; that Wess Holmes was an unmarried man living in the neighborhood; that he was a cousin of deceased's wife, worked for the kinspeople of deceased, and had been living in the neighborhood about a year and a half; that after defendant was informed of deceased's said statement he went to see Kittie Caruth about it, and on the stand she admitted that she told him that 'it was *false* from *beginning* to *end,* and that deceased was trying to ruin her in the neighborhood,' and that after this the brother of Kittie Caruth assured defendant that he had *investigated* it, and that his sister was innocent. The bill shows that the night before the killing defendant, in talking about said matters, showed he was 'restless, excited and crying,' and said that 'Roberson had *ruined the girls,* and that their mother was dead, and that they did not have much of a father, and that he felt towards them like a brother.' The bill recites that the evidence showed that Roberson was talking about *Blanche* Caruth also, and that deceased had said that his *wife* had told Wess Holmes that he had better leave, and that he had gone and left no trace behind and 'that it made *suspicion* point towards *him.'* The evidence showed that a day or two before deceased started said reports said Holmes left the country. Ed Hickey (a brother of Mrs. Roberson) carried him a circuitous route several miles out of the way, to Hillsboro, and Holmes immediately left the State. Holmes had been associating with Kittie Caruth, and carrying on a clandestine correspondence with her, which she admits was without the knowledge of her father. She admits that immediately after the shooting, she *burned* and destroyed all the letters from Holmes. Edgar Bilbry testified that three or four days prior to the homicide Holmes told him 'that Kittie was giving him hell because he was going with another girl,' and that witness asked him what he was going to do about it, and that Holmes replied: 'I don't give a damn; all I go to old Caruth's for, or any other place, is to get this stuff what they sit down on.' The bill recites that Kittie Caruth admitted on the stand not only that she assured defendant the evening before the killing that she was innocent, and that Roberson's statements were false, but that after the killing and before the birth of the baby, she had sworn before the grand jury that defendant had not had any carnal intercourse with her, and that in July, 1907, when the case was called for trial the *first time,* she assured defendant's attorneys that defendant

was innocent, and that she asked them to continue the case, and let *nine months* pass, so as to prove in that way that deceased's statements were false, and that on said occasion she went inside the bar and sat down *by defendant.* It further appears from this bill that at different times in February preceding the killing she talked with *deceased's wife* and took her into her confidence, and told her that her menses were irregular, and that her *monthly period* had failed to come, and requested her to get some medicine for this condition, and it is recited that Mrs. Roberson then went to Dr. Shoemaker (a relative of Mrs. Roberson's), and told him what Kittie had said, and that the doctor prepared two different kinds of medicine, and that Mrs. Roberson delivered same to Kittie, who took it. The bill shows that Kittie was in the family way at said time, and that Dr. Shoemaker waited on her the night the baby was born, and that the baby was found out in the weeds and brought in, and placed on the bed by her side. The bill alleges that: 'The leading and overshadowing issue in the case was as to the *paternity* of said child, the *State* contending through its testimony and argument to the jury that defendant was the father of said child, and the defendant contending and swearing that he was not the father of it,' etc., etc. In this connection appellant placed Mrs. Emma James on the stand. She was Kittie's aunt, and resided only a few miles from Caruth's home. She would have testified that in September, 1909, she received a letter from Kittie, telling her, among other things, 'that I have something to tell you,' and requesting her to come over, and saying, 'Please come over as soon as you can.' That witness went to Kittie's home that afternoon to see what she wanted. That she mentioned to Kittie about having received her letter, and then asked her what it was she wished to tell. That Kittie dropped her hands and said, 'Aunt Emma, I can't tell you this evening, it will take too long; you ask papa to let me come over and spend the day.' It seems that old man Caruth was in another part of the house at the time. *Mrs. James,* in compliance with Kittie's request, then arranged with Mr. Caruth for Kittie to come to witness' home on Saturday. On Saturday the girl went to Mrs. James' home. Mrs. James was very busy with a number of duties, so late in the afternoon witness asked her what it was she wished to tell her. Finally, after some conversation, Kittie got up and went into the kitchen, and witness followed her, and found Kittie 'with her head hung down,' and Mrs. James said, 'Kittie, you said you had something to tell me, and I see your papa coming, and you had better tell me,' and Kittie said, 'Aunt Emma, I can't, with her face turned away, and I says, 'Why?' and she says, 'I can't, Aunt Emma,' and began to cry. She says, 'I never will swear *any more lies,'* and she commenced crying, and I did, too, and walked off.' When the evidence was offered the State objected on the grounds that it was immaterial and irrelevant, and the court sustained the objections and declined to allow the introduc-

tion of same. The bill shows that proper predicates had been laid for this testimony, while Kittie was on the stand. Was the testimony admissible? We say it was, beyond the shadow of a doubt. The bill shows that said conversation occurred after the first trial, in Hill County, and after the second trial, which was in Ellis County, and the bill shows that upon both said trials Kittie had sworn that defendant was the father of her said child. The bill further recited:

'That this is the *only case* in which she had ever testified as a witness.'

The bill further shows that defendant's counsel stated to the court that Kittie's evidence as to the paternity of the child was damaging against defendant, and that the testimony of Mrs. James was offered as a circumstance to show that she had not told the truth as to the paternity of said child, and that at the time of said conversation with her aunt she desired to change her evidence.' This court in passing upon the bill held that said 'evidence was entirely too remote and uncertain to be admissible for the purpose claimed by appellant, or for any other purpose in the case, and the court did not err in excluding it.'

We are at a loss to know how this court reached the conclusion that the evidence was too remote. This bill, and many other bills, the charge of the court, in fact, the *whole record* shows that the pivotal point in this case was as to the paternity of said infant. The prosecution contended *that defendant was the father of said child, and therefore guilty of murder.* The defendant swore he had never had any carnal intercourse with said girl. She had been associating with Holmes, and carrying on a clandestine correspondence with him, and it is made to appear that he fled the country just *ten* days before the killing, and that Ed Hickey, a brother of Mrs. Roberson, conveyed him to the railway station by a circuitous route, several miles out of the way. It is perfectly manifest that he left in a clandestine and hurried manner. It is also made to appear that just before he left he virtually stated to Edgar Bilbry that his relations with said girl had been prompted by an evil motive on his part. Roberson himself had stated to different parties that Mrs. Roberson had told him to leave, and that he had gone and 'left no trace behind.' It is a significant fact in this record that Roberson did not start said reports until. *two days* after his relative, Wess Holmes, was safely gone. Then the deceased began to charge that 'Kittie Caruth was six months gone, and that Arthur Redman or Wess Holmes was the daddy of it.' The bill further shows that 'shortly after Holmes left, Kittie inquired of *deceased's wife* as to where *he was*.' Immediately after the homicide she burned all of Holmes' letters. Not only this, the bill further shows that in February she talked with Mrs. Roberson a number of times about her menses having failed to come on her, and Mrs. Roberson then procured medicines from Dr. Shoemaker and delivered it to her, which medicines she took. Dr. Shoemaker

was related by marriage to the Robersons. The bill also recites that at the time said medicine was procured that Kittie Caruth 'was in a family way at said time.' The issue as to who was the father of the child was sharply defined in the testimony. Any evidence that would shed light or tend to do so upon this all important point was admissible. This can not be successfully denied. Kittie Caruth had assured defendant the very night before the killing that she was innocent of Roberson's charges. She induced her brother to believe that she was innocent. She admits that a short time after the homicide that she swore before the grand jury that appellant had never had carnal relation with her. She admits that she induced defendant's attorneys to ask for a continuance on the ground that when nine months went by this would prove her innocence, and that on said occasion she went into the courtroom and sat down by defendant, and yet a *short* time after this, and in *three* months after the killing, she gave birth to said baby, and in some manner it had been placed in the weeds away from the fence, evidently in the hope that it would die, and then on said night she stated for the *first time* that 'Arthur Redman' was its father, and this admission was to Dr. Shoemaker, who had prepared the medicines for her in February, at the suggestion of Mrs. Roberson, who was a cousin of Holmes. When she broke down crying, and told Mrs. James that she could not tell her what was on her mind, but 'I never will swear any more lies,' what did she mean? What had caused her to write said letter and bring about the appointment? All the circumstances show she had previously made up her mind to make a revelation to her aunt. The bill shows affirmatively that this was the *only case* in which she was a witness. She necessarily had *this case* in mind. She necessarily had her previous testimony in this case in mind. The very circumstances show that her conscience was smiting her, that she had done a wrong. Her aunt was her friend, and she desired to make peace with her conscience. Her statement that 'I never will swear any more lies' was equivalent to saying that she had made untruthful statements as a witness. It is certain that she did not mean by this that her *original* testimony before the grand jury three years previous, that defendant had never had carnal intercourse with her, was false. Why? Because if that was false she had afterwards corrected it by swearing on the trial of the cause at Hillsboro, and still later on the trial at Waxahachie, that he did have carnal intercourse with her and was the father of her child, hence she would have been at peace with her conscience. It is inevitable that she had reference to her *subsequent* testimony. It is perfectly obvious that she had reference to this case, because she was a witness in no other case. The only *material* thing she had sworn to against defendant was that he was the *father* of her child. The jury were entitled to Mrs. James' evidence. It would, or might, have assisted them in solving the most important feature of the case. The evidence was admissible as af-

fecting the credibility of Kittie Caruth. There is no merit in the objection that it was too remote. Any objections to the testimony would go to its *probative force and weight,* and *not* to its admissibility.

This court has held in many cases that it is competent to prove statements of a witness that may show interest, motive or animus. It is equally well settled that any statement of a witness on a material issue may be shown that is in the nature of an attack upon the testimony or truthfulness of the witness, upon such issue. These rules are supported not only by the text-writers, but by the repeated decisions of this court: Watts v. State, 18 Texas Crim. App., 384; Hart v. State, 15 Texas Crim. App., 234; Mason v. State, 7 Texas Crim. App., 623; Blunt v. State, 9 Texas Crim. App., 234; Daffin v. State, 11 Texas Crim. App., 79; Tow v. State, 22 Texas Crim. App., 175; Bennett v. State, 28 Texas Crim. App., 540; Lyon v. State, 42 Texas Crim. App., 506; Magruder v. State, 35 Texas Crim. App., 219; Soger v. State, 11 Texas Crim. App., 110; Bonnard v. State, 25 Texas Crim. App., 195; Green v. State, 54 Texas Crim. Rep., 7; Reddick v. State, 47 S. W. Rep., 995; Gelber v. State, 56 Texas Crim. Rep., 462.

The next bill relates to the action of the court in depriving defendant of Dr. Menifee's testimony. This bill contains all the environments, facts and circumstances shown in the last preceding bill. In said connection the bill shows that defendant offered to prove by Dr. Menifee that on the day of the homicide, Mrs. Roberson had a conversation with him on her back porch, and told him that Kittie Caruth had come to her and gotten medicine from her twice in the last three months for the purpose of bringing on her monthly period, and had 'come the third time and asked her *where* Wess Holmes was, and that she had told her Wess Holmes was gone, and that Kittie then asked her if she did not think that Wess had left her in a bad fix, and that she told Kittie that she was not going to furnish her any more medicine, but was going to leave the matter to Kittie's grandfather.' The bill recites that *as a matter of fact* Kittie had reported her condition to Mrs. Roberson, and that the latter had gotten the medicine from Dr. Shoemaker. The court in the original opinion holds that this evidence was not admissible as original evidence, but intimates that whilst it might have been admissible for impeachment purposes, yet that appellant's counsel had not urged its admissibility on that ground in their brief. It is respectfully submitted that the bill shows directly that it was offered also on the ground of credibility, and that this was called to the attention of the court in the briefs. No extended argument was made to show its admissibility on the ground of impeachment, or as affecting the credibility of Mrs. Roberson or Kittie Caruth, for the reason that we deemed an argument on that point unnecessary. The rule is that no matter upon *how many* grounds a piece of evidence is offered, if it is admissible upon either ground it should be admitted. The proffered

evidence being upon a material issue in the case, and admissible for the purpose of contradiction and impeachment should have been admitted. Mason v. State, 7 Texas Crim. App., 623; Deneaner v. State, 58 Texas Crim. Rep., 624; Hunter v. State, 8 Texas Crim. App., 76; Bostick v. State, 11 Texas Crim. App., 126; Sanders v. State, 54 Texas Crim. Rep., 111; Adams v. State, 52 Texas Crim. Rep., 13; Boatright v. State, 42 Texas Crim. Rep., 443; Watson v. State, 9 Texas Crim. App., 237; Hill v. State, 18 Texas Crim. App., 673; Rosborough v. State, 21 Texas Crim. App., 675; Bennett v. State, 28 Texas Crim. App., 540; O'Neal v. State, 57 Texas Crim. Rep., 249.

It appears from another bill of exceptions that the State placed R. M. Vaughan, private counsel for the prosecution, on the stand, and proved by him that he had gone to Arkansas and talked with Wess Holmes; that he had received two letters from Holmes since then, and that the State had issued *various* process for him as a *witness* in this case, and that Holmes had *promised* to come and testify as a *witness* in this case, and that he (Vaughan) had *informed* defendant's attorneys as to the *whereabouts* of said Holmes, and had told counsel of his postoffice address, etc.

The bill shows that *defendant* was never notified of Holmes' location, and that the State did not even *offer* to show that *defendant* had any knowledge of Holmes' whereabouts, and had no knowledge that his attorneys had been *notified* as to where Holmes was. The defendant objected to said evidence because the evidence showed that *defendant* had received no notification, and because same was *hearsay,* and that the notification of his attorneys was not *binding* on defendant, and because said evidence was illegal, incompetent, immaterial, irrelevant and prejudicial. In the light of reason, as well as the authorities, these objections should have been sustained. The bill shows that Holmes fled the State ten days before the killing, and was conveyed to the railway station by Ed Hickey, a brother of Mrs. Roberson. Defendant had nothing whatever to do with his sudden flight, nor his conduct in *remaining* away from Texas. Then why should defendant be *bound* by said evidence? It was not only illegal, but was hearsay as to him. The trial judge placed a statement on the bill to the effect that 'defendant had sought throughout the trial to show that Holmes was the father of the infant, and had fled the country; that defendant had asked for a continuance at a previous term of court on account of Holmes' absence, and that the court had admitted said evidence, because the *State* could not take his depositions, and *defendant could,* and that said evidence was admitted 'to *rebut* the efforts being made all through the trial by implication and indirection to cast suspicion on Holmes.'

This *very* qualification shows the illegal purposes for which said evidence was *used.* , There is no way to answer the proposition that said evidence was hearsay as to appellant. The qualification shows

that the admission of this evidence gave the prosecution an opportunity to *argue* to the jury that the *State* was helpless and could *not* take Holmes' depositions, but that *under* the law *defendant* could take them, and as he had not done so, *then* that evidently the defense did not believe that his evidence would be *favorable* to defendant. And this was used as *incriminative* of defendant, and according to the court's *own* qualification on the bill, was used to '*rebut* the suspicion on Holmes,' as to the *paternity* of said child.

*Roberson, the deceased,* had put Holmes into this case. He had declared that his wife had told Holmes to leave, and that he 'had gone and had *left no trace behind,* which made suspicion point to him.' Ed Hickey, a *brother-in-law* of deceased, had put Holmes into the case by clandestinely helping him to leave the country, and Holmes *himself* had put his own personality into the case by his admissions to Edgar Bilbry just before his flight, and yet by the court's qualification, the State was permitted to *rebut these and other facts,* by proving where Holmes was, and that the *State* could not take his depositions, and the *defendant* could. If Holmes was the father of said infant, is it reasonable or rational to suppose for one moment that he would admit it, when to admit it would make him the responsible cause for the tragedy in this case, in the eyes of the public, as well as the indirect cause of an imposition and deception being practiced on this appellant. The fact that a continuance had been sought at a previous term of court on account of Holmes' absence was not before *this jury,* and is *foreign* to the issue. The opinion of the court in this case does not discuss this question at all, but simply holds that under the qualification of the trial judge on this bill no error was committed. The qualification of the trial judge not only does not impair the bill, but strengthens appellant's objections. This evidence was not admissible for any purpose, and the objections to it should have been sustained.

We confidently assert that this court has repeatedly decided the following propositions:

(1) The absence of a witness from a trial should not be used against a defendant, unless it is shown that he was *instrumental* in keeping the witness away.

(2) That it is error to permit the State to prove that it has made diligent search for a witness and tried to produce the witness.

(3) That it is error to permit the State to prove that *defendant* had not tried to produce a witness, and that the State had. Under first proposition: Askew v. State, 127 S. W. Rep., 1037; Clifton v. State, 46 Texas Crim. Rep., 22. Under second proposition: Clifton v. State, 79 S. W. Rep., 824; Estep v. State, 9 Texas Crim. App., 367; Favors v. State, 20 Texas Crim. App., 161; Luttrell v. State, 40 Texas Crim. Rep., 658. Under third proposition: Clifton v. State, 46 Texas Crim. Rep., 22; Hardin v. State, 55 Texas Crim. Rep., 634;

Sweeney v. State, recently decided; Rushing v. State, 25 Texas Crim. App., 612; Lankster v. State, 42 Texas Crim. Rep., 360.

This case presents some very strange conditions. Kittie Caruth testified that appellant had carnal intercourse with her once in her father's home; that it occurred in the night; that he had no engagement to come to her bed. That he had *never* mentioned such a subject to her. That appellant was sleeping with her brother Bert. It was dark and there was no light in the house. She says she does not know what woke her. That appellant never spoke one word to her during the transaction, and that she never said a word to him. That he never mentioned it to her afterwards, and she said nothing about it to him. That her brother Bert and sister Blanche and appellant's sister were all in the house at the time. That she gave no outcry, and never did tell this transaction afterwards, though she says this was the first time appellant had intercourse with her. She says she went to Goliad County a short time after this to visit appellant's people. That appellant had intercourse with her once there in his father's home. That appellant's father and several brothers and sisters of appellant were in the house at the time. That she does not know whether the act occurred in the *daytime* or *night-time,* and is not certain *which room* it happened in. That defendant had no engagement with her in reference to such act, and that he had never mentioned *love* to her. These are the only acts of intercourse she claims.

A very strange feature of this case is that she does not pretend that she ever called on defendant for *medicine,* or for *any other aid.* Instead of calling on him, she tells Mrs. Roberson that her monthly period had failed to come on her, and Mrs. Roberson goes to Dr. Shoemaker, and he prepares and sends the medicines to her by Mrs. Roberson. Mrs. Roberson was a cousin of Holmes, and the doctor was related by marriage to the Robersons.

Another significant fact is that Robertson seems to have known just how far Kittie's pregnancy had progressed. He charged that she was *six months* in the family way, and it transpires that just *three* months after he made this charge that she gave birth to the baby.

With the issue as to the paternity of said infant so sharply contested in the testimony, it was of the highest importance to the legal rights of appellant that the charge of the court should have fully and fairly presented the law on every issue in the case, and that no illegal evidence should have been permitted to go to the jury, and that upon the other hand, appellant should have been permitted to introduce all such facts and circumstances as would, directly or indirectly, bear upon the paternity of said child, or would affect the credibility of Kittie Caruth, on said branch of the case.

In conclusion, we submit that the appellant has not had a legal trial under the Constitution and laws of this State. The law of the case was not given in a proper charge to the jury. The errors in the charge are upon vital issues in the case, and were substantial and

important ones. The errors of commission were especially hurtful to the legal rights of appellant. We have also pointed out the errors of omission in the charge. Illegal, incompetent and hearsay evidence was introduced against him. Evidence of a material and important nature in *his behalf* was excluded. We have discussed no error of a light, trivial nature, but only those that must have had an important bearing on the trial. We have tried to discuss the errors in a faithful manner, and with due deference to this court. We have supported our position on each issue, not only with reason, but by decisions of this court, extending over almost its entire history.

The questions involved on this appeal are important, and of far reaching consequence. Great principles of law are at stake. The final decision to be rendered on these questions will affect, not only appellant, but the jurisprudence of Texas in the years to come, for as certain as the night follows the day, just so certain will these questions arise again."

I respectfully dissent for reasons stated herein.

PRENDERGAST, Judge (additional opinion), June 28, 1912.— The opinions herein already rendered are so lengthy that it seems useless to write any further. However, as the dissenting opinion has been furnished us and we reserved the right in overruling the motion for rehearing to further discuss any of the questions deemed necessary, we now add this brief additional opinion.

As it is shown by the dissenting opinion itself the argument and brief of Hon. C. F. Greenwood, the attorney for appellant, is adopted as such dissenting opinion. Of course, Mr. Greenwood is an extreme partisan in this case. His zeal for his client, we think, has caused him to say things in his dissenting opinion which, upon reflection, we think, would not be said.

As to the preliminary statement by Presiding Judge Davidson to the effect that the authorities cited by Mr. Greenwood in his argument and brief in the case were not discussed, but the effect of the opinion of the court is in conflict with them, is easily said, but we think not only difficult, but incapable of proof. In the argument of a question many cases may be cited. The case cited may correctly lay down some proposition of law, but that proposition of law may have no application to the question discussed when properly understood and analyzed. Such is the case in many of the decisions cited by Mr. Greenwood. It is never the purpose of this court to take up each case cited by counsel, show its application, or want of application, to the question under discussion, and because they are not so taken up and discussed by no means justifies the assertion that the opinion rendered is in conflict with them. We are sure that the opinion rendered in this case is not in conflict with any correct decision of this court. Most of them cited by Mr. Greenwood, in our judgment, are entirely inapplicable.

The dissenting opinion of Mr. Greenwood, where he states, "There are a number of very interesting and vital questions involved in this appeal which can not be appreciated or correctly solved without a clear, definite knowledge of the evidence, but with this knowledge they are of easy solution. The opinion of the court affirming the conviction does not present the questions, nor deal with them as presented in the record, in the *light* of the evidence." A remarkable charge to make! The evidence in this case is shown to this court by seventy-eight full pages of typewritten statement. In the consideration of the questions raised this evidence—the whole of it—was carefully read and reread and studied and restudied. The members of the court who handed down the decision herein were wholly disinterested, were in no way partisans. They were extremely anxious, as they are in every other case, to reach a correct solution of it, and only a correct solution. If the result of that was an affirmance, good and well. If, on the contrary, it resulted in a reversal of the case, it was just as satisfactory to the court. In other words, they studied the record of the case, the decisions and statutes applicable to the questions raised, reached their conclusion, and announced it from a wholly disinterested and unbiased and unprejudiced standpoint. On the contrary, the dissenting opinion in this case by Mr. Greenwood was written from an extreme partisan standpoint. He was very greatly interested in reaching only one result in the case, that is, its reversal. We do not blame him for being a partisan. He was properly a partisan, and could expected to be nothing else—the very reverse of what this court is with reference to this case, or any other case. Therefore we, with emphasis, assert that when he says, "The opinion of the court affirming the conviction does not present the questions nor deal with them as presented by the record, in the *light* of the evidence, to put it mildly, he is woefully mistaken." On the contrary, the very reverse of this is true. The questions raised are truly and fully presented. They are dealt with as presented by the record, and from the record only. Each and every one of them was presented, dealt with and decided in the *light* of the evidence, the whole of the evidence. The dissenting opinion of Mr. Greenwood, we think, presents the questions and deals with them, not from the record and not in the light of the evidence, but simply and solely from a partisan standpoint, quoting and stating only brief excerpts from the evidence which he thinks tends to support him in his contentions. While, as above stated, it took seventy-eight pages of typewritten matter to give the whole of the evidence, he condenses it in only about seven pages of his dissenting opinion, and that, as stated above, from a partisan standpoint, and from that standpoint alone.

We did not deem it necessary in the original opinion, and we do not deem it necessary now, because it could and would serve no useful service, to give in full this seventy-eight pages of evidence. Some

of the ten conclusions reached by the dissenting opinion and stated in paragraphs numbered from one to ten therein are correct, but such of them as correct are of minor importance. The material ones, when considered in the light of the whole record, are different from what is stated in the dissenting opinion. It is unnecessary to even take up these several matters, because from the statement of the case by the court, and the statement thereof in the previous appeal, the material questions raised and discussed can readily be understood.

What we have said about the evidence above and the standpoint from which it is given in the dissenting opinion, we also say as to the complaints of the charge of the court. Only short sentences thereof wherein certain criticisms are made of such paragraphs of the court's charge are given, not the whole of it, and as, we think, only such portions of it are given in the dissenting opinion from which such criticisms are attempted to be justified. It is useless to again give the full charge of the court or to take up and discuss these criticisms thereof. All of them were thoroughly and fully considered before the original opinion was written, and there is nothing in the dissenting opinion that causes us in any way to change our original opinion herein.

The dissenting opinion shows a strained effort to base manslaughter on the claimed insulting remarks about Blanche Caruth, and that appellant's offense should be reduced from murder in the second degree to manslaughter because thereof. The whole record without question and overwhelmingly shows that appellant at no time and in no way was resenting the claimed insulting reports by deceased concerning Blanche. His whole conduct was predicated exclusively upon said reports which concerned him and Kittie Caruth only. The court properly submitted that if the reports made and circulated by deceased to the effect that Kittie Caruth was in family way and six months gone by appellant, and that that was true, in effect, he had no right to resent it and then claim that he was only guilty of manslaughter, because he killed the deceased. This question was found against him by the jury, and the point in law was decided against him both on the original appeal and on this, and the dissenting opinion does not contest the decision on this appeal or the former appeal on that point. So that his criticism of the court's charge about "repeating" the insulting statements and a "new" and "fresh" provocation because they were repeated by deceased, has no application to a correct decision of the questions. The law is they were not adequate cause, whether originally made, repeated or reiterated. If appellant killed deceased because thereof his offense would not and could not be reduced to manslaughter. So that it was unnecessary to take up and discuss at length or at all appellant's contentions thereabout, or any of the other questions raised about the insulting remarks about Blanche Caruth.

It is useless to again take up and discuss the various questions

shown by appellant's several bills of exception. Even if it should be conceded, which we do not, that the evidence introduced showing that the deceased was assistant superintendent of a Sunday-School was inadmissible, it was no ground whatever for reversing this cause. Coyle v. State, 31 Texas Crim. Rep., 604; Tweedle v. State, 29 Texas Crim. App., 590. It is needless to cite the many other cases to the same effect. The same might be said of the fact that Kittie Caruth when recalled to the stand, without it being noticed, brought her child with her. It is inconceivable to us that either or both of these insignificant circumstances, even if they were improper, could possibly have affected the trial of this case. Certainly, the jury of twelve impartial, disinterested men would not violate their oaths and ignore all of the testimony in the case, showing beyond doubt the unjustifiable killing of the deceased by appellant, because the deceased was the assistant superintendent of a Sunday-School, or that the woman brought her child into the courtroom so the jury could see it. No stress was laid upon either of these insignificant facts. That the child was inadvertently brought into the courtroom, as shown by the record, was in no way referred to by anyone, and the record fails to disclose that the fact that the deceased was assistant superintendent of a Sunday-School was in any way referred to or discussed. These matters were ignored in every way, and the jury and the counsel on both sides, and the court, to the exclusion of them, devoted their attention and efforts to the real material facts in the case, and it is impossible for us to conceive how these insignificant facts could by any possibility have affected the verdict of the jury.

We reiterate that the testimony of Mrs. James, which was attempted to be introduced by appellant, was wholly speculative, entirely remote, and could not possibly in any way have aided the jury in arriving at a verdict. Speculative evidence from which it is attempted to draw uncertain and speculative conclusions can not be introduced. Cases are not tried on such far-fetched, uncertain and wholly speculative evidence. They are tried on evidence that is material, that has something to do directly with the transaction, and the exclusion of her testimony would not and could not have affected the verdict of the jury. The same might be said as to the excluded testimony of Dr. Menefee. His testimony, which was rejected, was not sought to be introduced for any other than a wholly improper use and purpose, and even if it had tended to impeach the witness, Kittie Caruth or Mrs. Roberson, or both of them, it could not have affected and did not affect the result of the case.

The testimony of Mr. Vaughan was unquestionably admissible. Sweeney v. State, 65 Texas Crim. Rep., 593, 146 S. W. Rep., 888.

It is useless to write further.